## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| CARL TANKESLEY, as Personal Representative of the Estate of Anna Tankesley, Deceased, Plaintiff, | ) ) ) ) | |
| v. | ) ) | Civil No. 1:21-CV-1448 |
| KATHERINE VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, Defendant. | ) ) ) ) ) ) | |

### MEMORANDUM OPINION

Plaintiff Carl Tankesley, as personal representative of Anna Tankesley (deceased),[1] has sued Tankesley's former employer: the Director of the United States Patent and Trademark Office ("USPTO"). Before her death on April 2, 2021, Tankesley was a Human Resource Specialist in the Office of Human Resources in the USPTO. While working at the USPTO, Tankesley underwent chemotherapy for cancer. In Spring 2010, LaRita Jones became Tankesley's new supervisor and plaintiff alleges that this event marked the beginning of the alleged course of discrimination against Tankesley that forms the basis of the Amended Complaint (Dkt. 14).

Following disposition of a motion to dismiss,[2] plaintiff proceeded to discovery on three counts: (i) Count I – disability discrimination in violation of the Rehabilitation Act; (ii) Count II –

---

[1] Courts uniformly recognize that discrimination cases may be maintained by the personal representative of a deceased plaintiff where the damages sought are not penal in nature. *See, e.g., Fariss v. Lynchburg Foundry*, 769 F.2d 958 (4th Cir. 1985) (recognizing that claims for back wages under the ADEA survive the death of the plaintiff-employee). Throughout this Memorandum Opinion, Plaintiff Carl Tankesley is referred to as "plaintiff" or "Carl Tankesley" and Anna Tankesley is referred to as "Tankesley."

[2] *See* Order, dated June 17, 2022 (Dkt. 34) (granting in part and denying in part the motion to dismiss).

retaliation in violation of the Rehabilitation Act; and (iii) Count III – disability-based and retaliatory hostile work environment in violation of the Rehabilitation Act.[3]

At issue now is defendant's motion for summary judgment on all three remaining claims. As a preliminary matter, the parties dispute whether certain statements by Tankesley and her former supervisor Sabrina Lewis submitted in this action may be considered in resolving defendant's motion for summary judgment. Oral argument was heard and all matters relevant to summary judgment have been fully briefed. According, the motion is ripe for consideration. This Memorandum Opinion proceeds in two parts: first, determining what evidence may be considered at summary judgment, and, second, proceeding to the merits of defendant's motion for summary judgment.

I.

The standard for summary judgment is too well-settled to require extensive elaboration. Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). Of course, at the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). But disputed facts can bar summary judgment only if they are "material," which means that they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the Fourth Circuit and the Rules of Civil Procedure make clear, when opposing summary judgment, a party may rely on affidavits or declarations only if they "would be

---

[3] Plaintiff was granted leave to amend her claims of age-based hostile work environment and of a race-based hostile work environment but did not do so. Accordingly, the case has proceeded only on the three Rehabilitation Act claims.

admissible in evidence at trial." *Burwick v. Pilkerton*, 700 F. App'x 214, 216 (4th Cir. 2017). Moreover, as the Rules and courts recognize, the "burden is on the proponent [of a piece of evidence] to show that the material is admissible." Fed. R. Civ. P. 56(c)(2), adv. comte. notes; *Domestic Violence Survivors Support Grp., Inc. v. Crouch*, 2022 WL 1044688, at *1 (4th Cir. Apr. 7, 2022) (Unpublished).[4] Where a declarant or affiant is unavailable for trial, a hearsay exception must apply to allow consideration of the declarant's statements because out-of-court statements are ordinarily hearsay, and, if "no exception to the hearsay rule would allow the admission" of the declaration or affidavit, then district courts "may not consider the affidavits [or declarations] at the summary judgment stage." *Id.* (citing *Md. Highways Contractors Ass'n, Inc. v. Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991)). It is also well-settled within the Fourth Circuit that "where a party submits an affidavit that is inconsistent with a witness's deposition testimony, the contradictory affidavit is disregarded for purposes of summary judgment." *Green v. Nat'l Archives & Records Admin.*, 992 F. Supp. 811, 822 (E.D.Va. 1998).[5]

## II. Admissibility of Anna Tankesley's Statements

A preliminary issue is whether certain out-of-court statements may be considered in resolving defendant's motion for summary judgment. Specifically, in responding to defendant's motion for summary judgment, plaintiff relies on several exhibits which include statements from the deceased Anna Tankesley. Many of these documents were submitted either as part of an

---

[4] *See also United States v. Tsoa*, No. 1:13cr137, 2013 WL 6145664, at *6 (E.D. Va. Nov. 20, 2013) (mentioning that "the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception").

[5] *See also In re Family Dollar FLSA Litig.*, 637 F.3d 508, 513 (4th Cir. 2011) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 976 (4th Cir. 1990) (where a witness's deposition testimony and affidavit conflicted, "the district court was left not with a genuine issue of material fact, but with trying to determine which of several conflicting versions of Dr. Cox's testimony was correct").

investigation by the USPTO's Equal Employment Office ("EEO") or before the Equal Employment Opportunity Commission ("EEOC") as part of prior proceedings initiated by Tankesley.[6] The documents include:

i.   Anna Tankesley's 2017 Deposition Transcript (Dkt. 54-2) ("2017 Tankesley Deposition");[7]

ii.  Anna Tankesley's October 21, 2011 Affidavit in the EEO investigation (Dkt. 54-7) ("2011 Tankesley EEO Affidavit");

iii. Anna Tankesley's November 29, 2011 Supplemental Affidavit in the EEO investigation (Dkt. 60-2) ("2011 Tankesley Supplemental EEO Affidavit"); [8]

iv.  Anna Tankesley's March 31, 2017 declaration in support of her motion for summary judgment before the EEOC (Dkt. 54-5) ("2017 Tankesley EEOC Declaration");[9]

v.   Anna Tankesley's October 20, 2010 email to Sabrina Lewis (Dkt. 54-13) ("2010 Tankesley Email");

vi.  Anna Tankesley's March 22, 2010 email and memorandum to LaRita Jones (Dkt. 54-17) ("March 2011 Tankesley Email"); and

vii. Anna Tankesley's September 2, 2011 email to Patricia Mendoza[10] (Dkt. 54-20) ("Sept. 2011 Tankesley Email').

Collectively, the 2011 Tankesley EEO Affidavit, the 2011 Tankesley Supplemental Affidavit, and

---

[6] As discussed, *infra*, Lewis also submitted an EEOC charge and initiated proceedings against the USPTO.

[7] Although Tankesley sat for two depositions – one in 2013 and one in 2017 – plaintiff cites only the 2017 deposition transcript. *See* Pl. Suppl. Br. at 23 (Dkt. 60) (noting that Tankesley was deposed on February 10, 2013 and February 10, 2017, but that plaintiff has only offered portions of the 2017 deposition). Defendant relies on excerpts from both deposition transcripts which were included in docket entry 51-1 and 51-2 as Defendant Exhibits 1 and 16.

[8] Plaintiff originally submitted the 2011 Tankesley Supplemental EEO Affidavit at docket number 54-24. At the December 2022 hearing and in the subsequent Order, it was noted that docket 54-24 was unsigned, undated, and unnotarized. *See* Order, dated December 9, 2022. In his supplemental filing, plaintiff replaced docket 54-24 with docket 60-2, which he suggests is the complete, signed version of the 2011 Tankesley Supplemental EEO Affidavit. *See* Dkt. 60-2. As discussed further, *infra*, however, there are significant issues with docket 60-2 as well.

[9] In plaintiff's supplemental brief, plaintiff erroneously reports that the 2017 Tankesley EEOC Declaration was dated March 31, 2017. *See* Pl. Suppl. Br. at 10 (Dkt. 60). A review of the record shows that the declaration to which plaintiff refers – the declaration filed at docket 54-5 – is the 2017 Tankesley EEOC Declaration and that declaration reflects on page 11 that it was signed on March 31, 2017.

[10] Mendoza also supervised Tankesley at the USPTO.

the 2017 Tankesley EEOC Declaration are referred to as the "Tankesley Affidavits and Declaration." Furthermore, the 2010 Tankesley Email, the March 2011 Tankesley Email, and the Sept. 2011 Tankesley Email are collectively referred to as the "Tankesley Emails."[11] All of these disputed documents are collectively referred to as the "Tankesley Affidavits, Declaration, and Emails."

The parties agree that, pursuant to Rule 804(b)(1)(A), the deposition transcripts may be considered on summary judgment.[12] Defendant argues that the remaining six documents – the Tankesley Affidavits, Declaration, and Emails – are inadmissible hearsay and cannot be considered. In opposition, plaintiff argues: (i) that the contested documents are not inadmissible hearsay; and (ii) that, in any event, they are admissible under the residual exception in Rule 807, Fed. R. Evid. For the reasons stated below, plaintiff is incorrect, and the Tankesley Affidavits, Declaration, and Emails must be excluded as inadmissible hearsay.

A. The Tankesley Affidavits, Declaration, and Emails are Hearsay

To begin with, the Tankesley Affidavits, Declaration, and Emails clearly constitute hearsay because they are out-of-court statements offered for the truth of the matter asserted. *See* Rules 801, 802, Fed. R. Civ. P. Although affidavits and declarations may be considered at summary judgment where a declarant is available, here Tanklesy is not available and the Tankesley Affidavits, Declarations, and Emails are thus inadmissible unless a hearsay exception applies. *See Humphreys & P'ners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 539 (4th Cir. 2015) (noting that the admissibility of reports and declarations "themselves is immaterial" because an

---

[11] Defendant argued that the Tankesley Emails are hearsay in its Reply brief. *See* Reply at 4 & n.5 (Dkt. 56). Plaintiff had the opportunity to address this argument in his supplemental brief, but did not do so.

[12] Rule 804(b)(1) provides that testimony of an unavailable witness given during a lawful deposition, whether in the current proceeding or a different one, and offered against a party who had – or, as in a civil case like this one, whose predecessor in interest had – an opportunity and similar motive to develop testimony is admissible. Tankesley's two depositions meet this exception.

"admissible form [. . .] is anticipated" through testimony); *Loney*, 2000 WL 530319, at *3 (holding that affidavits were properly excluded on summary judgment where affiants were unavailable, and no hearsay exception applied).[13]

Plaintiff failed to address whether the Tankesley Emails are hearsay and plaintiff's argument that the Tankesley Affidavits and Declaration are not hearsay misses the mark.[14] Plaintiff argues that the Tankesley Affidavits and Declaration meet the requirements of Rule 56(c)(4), and are therefore not hearsay. But Rule 56(c)(4) incorporates the requirement that an "affidavit or declaration set out facts that would be *admissible in evidence*." Rule 56(c)(4) (emphasis added). As discussed above, the Tankesley Affidavits and Declaration contain out-of-court statements that are relied on for the truth of the matter asserted and cannot be converted to an admissible form at trial. Accordingly, they are hearsay.

B. The Tankesley Affidavits and Declaration Do Not Fall Within a Hearsay Exception

Because the Tankesley Affidavits and Declaration are hearsay, they are inadmissible unless the statements contained therein fall within a hearsay exception. The burden is on plaintiff as the proponent of the Tankesley Affidavits and Declaration to establish that those documents fall within

---

[13] *See also Fleck v. Dep't of Veterans Affairs*, 2023 WL 143336, at *5 (D.D.C. Jan. 10, 2023) ("An affidavit or declaration . . . is permissible summary judgment evidence not because the affidavit or declaration itself is admissible trial evidence, but because it is a statement made under penalty of perjury that provides a substitute for live testimony and can, thus, 'be[] converted into admissible evidence.'").

[14] Plaintiff also makes two other brief arguments: (i) that defendant failed to identify which portions of the Tankesley Affidavits and Declaration are inadmissible; and (ii) that defendant failed to raise this issue pursuant to a motion to strike or notice an evidentiary hearing. *See* Pl. Suppl. Br. at 12. First, as defendant correctly notes, it is not defendant's burden to identify what portion of the affidavits and declaration are inadmissible. *See* Fed. R. Civ. P. 56(c)(2), advisory committee notes; *Crouch,* 2022 WL 1044688, at *1. In any event, defendant contends that the entirety of those three documents are inadmissible. Second, plaintiff points to no rule or other authority requiring defendant to file a motion to strike. Although defendant could have filed a motion to strike, defendant instead noted the issue in its memorandum in support of summary judgment (Dkt. 51), then also raised the issue more specifically in its reply brief (Dkt. 56), and finally discussed the issue at oral argument, before addressing the issue at length in its supplemental brief (Dkt. 61); nothing further was needed to raise this issue. Moreover, because this issue has been fully briefed and argued, no evidentiary hearing was necessary.

a hearsay exception. *See* Fed. R. Civ. P. 56(c)(2), advisory committee notes; *Crouch,* 2022 WL 1044688, at \*1. At points, plaintiff suggests that there may be some, as yet unidentified, hearsay exceptions that apply to certain paragraphs of one or more of the disputed documents, but plaintiff has failed to raise those specific arguments.[15] *See Aikens v. Ingram*, 652 F.3d 496, 506 (4th Cir. 2011) (Diaz, J. concurring) ("Yet it is not the role of the district court to act as a roving advocate, providing legal arguments to the parties before it."); *cf. Carlson v. Boston Scientific Corp.*, 856 F.3d 32, 325 (4th Cir. 2017) ("The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties – not the court."). In their supplemental briefing on this issue, the parties discuss only two possible hearsay exceptions: Rule 804, the rule governing unavailable declarants, and Rule 807, the residual hearsay exception. *See* Rules 804, 807, Fed. R. Evid. Because neither Rule 804 nor Rule 807 applies to the circumstances presented here, the Tankesley Affidavits and Declaration must be excluded as inadmissible hearsay.

To begin with, because plaintiff's supplemental brief does not address Rule 804 with respect to the Tankesley Affidavit and Declaration, plaintiff essentially concedes that Rule 804 does not render the Tankesley Affidavits and Declaration admissible. This is for good reason; although Tankesley is clearly unavailable, the Tankesley Affidavits and Declaration do not fall

---

[15] Other than Rules 804 and Rule 807, the only specific hearsay exception raised by plaintiff is with respect to paragraph 5 of the 2017 Tankesley EEOC Declaration, in which Tankesley describes her medical conditions. Plaintiff asserts that this paragraph falls within Rule 803(4), which plaintiff describes as excepting "statements regarding medical conditions." Opp'n Br. at 3, n. 3. Plaintiff's argument fails; the requirements of Rule 803(4) are not met. To fall within Rule 803(4) a statement must be: (i) "made for – and is reasonably pertinent to – medical diagnosis or treatment" and (ii) describe the declarant's medical history, symptoms, or the cause of any symptoms. Rule 803(4), Fed. R. Evid. As the Fourth Circuit has explained, "[t]he hearsay exception for statements made for purposes of medical diagnosis or treatment is based on the rationale that 'the declarant's motive guarantees [the statements'] trustworthiness' since treatment will depend on what is reported." *Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir. 1988). Here, there is no expectation of a medical diagnosis or treatment that would guarantee the trustworthiness of any statement; instead, these are documents that were prepared to support Tankesley's claims in the EEOC investigation and proceedings. Accordingly, statements by Tankesley regarding her medical conditions in the 2017 Tankesley EEOC Declaration, and any other statements in her affidavits, do not fall with the hearsay exception in Rule 803(4).

within any of the categories of statements excepted from the hearsay rule. Specifically, Rule 804(b) provides for the admissibility of the following categories of statements if the declarant is unavailable: (i) former testimony; (ii) statements under the belief of imminent death; (iii) statements against interest; (iv) statements of personal or family history; or (v) statements offered against a party that wrongfully caused the declarant's unavailability. *See id.* The Tankesley Affidavits and Declaration do not fit any of those categories and therefore Rule 804 does not apply. Moreover, district courts uniformly reject the "proposition that an unavailable declarant's affidavit is an exception to the general rule against hearsay." *Sommerfield v. City of Chicago*, 2014 WL 12802520 (N.D. Ill. July 8, 2014); *see also Tate v. Zaleski*, 2021 WL 5811965 (S.D. Miss. Dec. 7, 2021) ("The Plaintiffs fail to cite any authority supporting their position that the affidavit of an unavailable witness is an exception to the general rule against hearsay."). Accordingly, the Tankesley Affidavits and Declaration do not fall within the hearsay exceptions in Rule 804(b).

Plaintiff seeks to rescue the admissibility of the Tankesley Affidavits and Declaration by focusing his argument on Rule 807, the residual hearsay exception, and arguing that the Tankesley Affidavits and Declaration are trustworthy with strong indicia of reliability. Here too plaintiff's arguments fail. As the Fourth Circuit has repeatedly explained, the residual exception is to "be used very rarely, and only in exceptional circumstances." *United States v. Gomez*, 774 F. App'x 136, 137 (4th Cir. 2019) (quoting *United States v. Heyward*, 729 F.2d 297, 299-300 (4th Cir. 1984)).[16] To qualify for the hearsay exception in Rule 807, the statement must be supported by sufficient guarantees of trustworthiness *and* must be more probative on the point for which it is

---

[16] Plaintiff claims that the Fourth Circuit has rejected a narrow reading of the residual exception. Not so. The case that plaintiff cites, *United States v. Clarke*, 2 F.3d 81 (4th Cir. 1993), addressed a prior version of the residual exception that was part of Rule 804. In *Clarke*, the Fourth Circuit rejected a construction of the prior residual exception that would essentially render the exception a "nullity." *Id.* at 83. That the Fourth Circuit rejected such a construction of the prior rule does not mean that the Fourth Circuit intended for Rule 807 to be broadly applied. To the contrary, the Fourth Circuit has stated since *Clarke* was decided that the residual exception should be applied "rarely." *Gomez*, 774 F. App'x at 137.

offered than any other evidence that the proponent can obtain through reasonable efforts. *See* Rule 807(a), Fed. R. Evid. Whether the statement enjoys sufficient guarantees of trustworthiness is the most important factor in determining whether a statement falls within the exception. *United States v. Dunford*, 148 F.3d 385, 393 (4th Cir. 1998). In determining the trustworthiness of a statement, an oath alone is enough to ensure trustworthiness. *See United States v. Fernandez*, 892 F.2d 976, 981 (11 Cir. 1989) (holding "an oath alone, is an inadequate safeguard"); *Stokes v. City of Omaha*, 23 F.3d 1362, 1367 (8th Cir. 1994) ("Although the information in the affidavit was given under oath, it lacks the sufficient guarantees of trustworthiness . . . ."). Moreover, district courts analyzing indicia of trustworthiness are instructed *not* to consider a statement's consistency with other evidence offered in the case. *See United States v. Shaw*, 69 F.3d 1249, 1253 n.5 (4th Cir. 1995) (holding that trustworthiness cannot be assessed "from its consistency with other evidence offered in the case"); *United States v. Lucas*, 836 F. App'x 142, 146 (4th Cir. 2020).

An analysis of the totality of the circumstances here demonstrates that the Tankesley Affidavits and Declaration lack sufficient guarantees of trustworthiness because they consist solely of statements made by Tankesley in pursuit of her claims against the USPTO. Specifically, the statements made in Tankesley's two 2011 affidavits were made to instigate an EEO investigation and her 2017 declaration was made to support her motion for summary judgment before the EEOC. Those statements were not substantiated by the EEO or the EEOC. *See* Am. Compl. ¶ 8; Def. Mem. in Supp. of SJ at ¶¶ 65, 68; Opp'n Br. at 7 (noting paragraphs 65 and 68 are undisputed).[17] As the Fourth Circuit has confirmed, statements made "within the context of a drawn out and bitter" dispute, like this one, "provide[] sufficient cause for concern about fabrication and amplified perceptions," such that those statements are not admissible pursuant to Rule 807. *United*

---

[17] All references to page numbers in the opposition brief refer to the page numbers included on the bottom of the page and not the CM/ECF page numbers.

*States v. Lentz*, 282 F. Supp. 2d 399, 425-26 (E.D. Va. 2002) *aff'd* 58 F. App'x 961 (4th Cir. 2003).

Other circumstances also make clear that the Tankelesy Affidavits and Declaration do not contain indicia of trustworthiness necessary to meet the residual exception in Rule 807. Importantly, although plaintiff contends that the USPTO had the opportunity to cross-examine Tankesley on each of the statements made in her 2011 affidavits, plaintiff does not point to any deposition testimony where Tankesley was questioned about her 2011 affidavits. Importantly, the Fourth Circuit has even affirmed the exclusion of prior trial testimony as lacking indicia of trustworthiness for purposes of Rule 807 where counsel in the prior trial did not provide vigorous cross-examination. *See United States v. Lucas*, 836 F. App'x 142, 146 (4th Cir. 2020) (affirming the exclusion of prior trial testimony by an unavailable witness for the trial of a second defendant). Moreover, the 2017 Tankeslesy Declaration was made *after* Tankesley's 2017 deposition and the USPTO never even had an opportunity to cross-examine Tankesley on those statements. Plaintiff also argues that corroboration by other witnesses supports a finding of trustworthiness, but the Fourth Circuit has expressly instructed district courts not to consider such corroboration. *See Shaw*, 69 F.3d at 1253 n.5 (holding that the district court erred in looking to "other corroborating evidence in the record"); *see also Lucas*, 836 F. App'x at 146 (same). Thus, these circumstances support that Tankesley's Affidavits and Declaration lack indicia of trustworthiness.

Other district courts are in accord.[18] The facts of *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834 (N.D. Ill. 2005), closely resemble the facts of this case. In *Stolarczyk*, the plaintiff, like plaintiff here, represented the estate of a deceased employee suing under the ADA. *See id.* at 387. At summary judgment, the *Stolarczyk* plaintiff

---

[18] *See, e.g., Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834 (N.D. Ill. 2005); *Gem Financial Service, Inc. v City of New York*, 2022 WL 409618, at *5 (E.D.N.Y. Feb. 10, 2022) (excluding an affidavit as unreliable because it was a "litigation document").

attempted to rely on the decedent's EEOC Charge under Rule 807. *See id.* at 840. The district court found, however, that the EEOC Charge lacked appropriate trustworthiness because it was "favorable to Stolarczyk and her alone, and she had a substantial motivation . . . to embellish, as she clearly appreciated that she was laying out her litigation position." *Id.* at 841. Plaintiff points to no contrary authority where a court held that documents similar to the Tankesley Affidavits and Declaration were admissible pursuant to Rule 807. Accordingly, case authority supports that the Tankesley Affidavits and Declaration do not fall within Rule 807 and are therefore inadmissible.

A close examination of the 2011 Tankesley Supplemental EEO Affidavit also reveals particular problems with that document. As the December 9, 2022 Order in this case noted, the original purported 2011 Tankesley Supplemental EEO Affidavit submitted by plaintiff as docket 54-5 was not signed, dated, or notarized. *See* December 9, 2022 Order (Dkt. 58); Dkt. 54-5. In response, plaintiff attempted to cure the noted defects and submitted docket 60-2 with his supplemental brief, which purports to be the signed version of the 2011 Tankesley Supplemental EEO Affidavit. *See* Pl. Suppl. Br. at 10 (Dkt. 60); Dkt. 60-2. There continue to be discrepancies, however, indicating that the 2011 Supplemental EEO Affidavit lacks trustworthiness.

The first troubling difference is the different pagination scheme used in the the newly submitted signature page. The first eight pages of docket 60-2 are labelled "Page 1 of 1," "Page 2 of 2," etc. whereas the newly submitted ninth page is labelled "page 9 of 39." *Comp.* Dkt. 60-2 at 1-8 *with id.* at 9. Second, close examination of the newly submitted ninth page also reveals that it inexplicably duplicates, verbatim, language contained on the eighth page of the same document. *Comp.* Dkt. 60-2 at 8 (listing "SQ8 Do you have anything further to add?" and documenting the answer) *with* Dkt. 60-2 at 9 (repeating "SQ8 Do you have anything further to add?" and the answer). Finally, the font size on the newly submitted signature page does not the font size on the

other eight. This apparent difference in font size means that language that took eight lines on page eight takes only six lines when it was inexplicably repeated on page nine. *Comp.* Dkt. 60-2 at 8 (the response to SQ8 takes eight lines) *with* Dkt. 60-2 at 9 (the response to SQ8 takes six lines). Again, this suggests that the newly submitted page nine does not belong with the rest of the document. In sum, there is a different page numbering system, different font size, and inexplicable duplication of language between the newly submitted signature page – page nine – and the prior eight pages. There is thus no way to ascertain with any confidence whether Tankesley was attesting to any of the statements contained on pages 1-8 of docket 60-2 when she signed the newly submitted, differently numbered page 9. Accordingly, for these reasons, the 2011 Tankesley Supplemental EEO Affidavit in particular lacks indicia of trustworthiness as required by Rule 807.

Even assuming, *arguendo*, that the Tankesley Affidavits or Declaration provided sufficient indicia of trustworthiness, that would not end of the Rule 807 analysis. Rule 807 also requires that statements be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Rule 807(a)(2). Here, the parties agree that plaintiff may rely on Tankesley's 2017 deposition. Although plaintiff suggests that the Tankesley Affidavits and Declaration "are highly probative of material facts relevant to establishing pretext," Pl. Supp. Br. at 14, plaintiff does not cite anything specific in support of that statement and has not demonstrated that the Tankesley Affidavits and Declaration are more probative on pretext than the deposition transcript. Importantly, plaintiff has emphasized that Tankesley was questioned on the affidavits during the 2017 deposition. *See* Pl. Suppl. Br. at 14. Therefore there is no reliable or persuasive reason to conclude that the Tankesley Affidavits and Declaration are more probative than her deposition testimony.[19]

---

[19] *See Emhart Indus., Inc. v. New England Container Co.*, 2014 WL 5808390, at *5 (D.R.I. Nov. 7, 2014) (excluding statement because the deposition testimony was more probative evidence); *Assoc. Terminals of St. Bernard, LLC v.*

In sum, the Tankesley Affidavits and Declaration are hearsay and plaintiff has identified no applicable hearsay exception.  Specifically, the Tankesley Affidavits and Declaration do not fall within the hearsay exceptions in Rules 804 because they are not prior testimony and they do not fall within the residual hearsay exception in Rule 807 because the statements in each of the disputed documents were made in furtherance of Tankesley's claims against the USPTO. *See United States v. Devillasee*, 199 F.3d 1328, 1999 WL 969701 (4th Cir. Oct. 25, 1999) (Unpublished) (affirming the district court's exclusion of a witness summary prepared by a government agent). It is worth noting, however, that plaintiff could have avoided the exclusion of these statements had plaintiff: (i) specifically elicited the testimony from Tanksey that he seeks to introduce by affidavit and declaration in either of her two prior depositions; (ii) sought to redepose Tankesley in the EEOC proceedings; or (iii) sought to depose Tankesley under Rule 27, Fed. R. Civ. P., before her death.  Accordingly, the Tankesley Affidavits and Declaration are inadmissible and may not be relied upon at summary judgment.

## C. The Tankesley Emails Do Not Fall Within a Hearsay Exception

Neither party specifically addresses whether the Tankesley Emails fall within a hearsay exception. Again, the burden is on plaintiff as the proponent of the evidence to establish that they are admissible. *See* Fed. R. Civ. P. 56(c)(2), adv. comte. notes.  Nonetheless, it is clear from a review of the Rules of Evidence that no hearsay exception applies.  The Tankesely Emails do not fall within the delineated exceptions of Rule 804 discussed *supra*.  Nor do the Tankesley Emails fall within the business records exception to the hearsay rule, Rule 803(6).[20]  As the Fourth Circuit

---

*Potential Shipping HK Co., Ltd*, 2018 WL 947660 (E.D. La. Feb. 16, 2018) (holding that an expert report was not admissible under Rule 706 because the it was less probative than the expert's deposition testimony).

[20] Rule 803(6) provides an exception for a record of an act, event, condition, opinion, or diagnosis if: (a) the record was made at or near the time by someone with knowledge; (ii) the record was kept in the course of regularly conducted business; (iii) making the record was a regular practice; (iv) all these conditions are shown by the testimony of the custodian or another qualified witness; and (v) the opponent does not show that there is a lack of

has noted, it is "insufficient to survive a hearsay challenge simply to say that since a business keeps and receives emails, then *ergo* all those emails are business records." *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013). On this record, there is no information about the Tankesley Emails other than that Tankesley sent them using her USPTO email address and the USPTO apparently retained them. As the Fourth Circuit recognized in *Cone*, this is not enough to overcome a hearsay challenge. Nor do these emails have any specific guarantees of trustworthiness sufficient for Rule 807. In particular, the March 2011 Tankesley Email is Tankesley's response to a proposed suspension, which suggests that she had an incentive to write it in the light most favorable to her. *See* March 2011 Tankesley Email. Accordingly, the Tankesley Emails must be excluded as inadmissible hearsay.

### III. Admissibility of Paragraph 15 of Sabrina Lewis' Declaration

Defendant also argues that the declaration of Sabrina Lewis, dated April 15, 2013, is a sham affidavit (Dkt. 54-9) ("Lewis Declaration") and thus cannot be relied upon at summary judgment. Lewis was the Patent Branch Chief and became Tankesley's first-line supervisor August 2010. She also instituted her own EEO complaint and EEOC proceedings against the USPTO. Plaintiff argues that Lewis' declaration is not a sham affidavit and instead merely clarifies Lewis' deposition testimony. Specifically, the parties focus their discussion on paragraph 15 of the Lewis Declaration and so too will the analysis here.

The Fourth Circuit adheres to the "long-standing principle that a party against whom summary judgment is sought cannot create a jury issue by identifying discrepancies in his own account of the facts." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7 (4th Cir. 2001). This principle, known as the "sham affidavit doctrine," results in the exclusion of statements that are

trustworthiness.

14

"inherently inconsistent with deposition testimony." *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990).  As the Fourth Circuit has noted, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).  Thus, the Fourth Circuit has instructed that where there is "a bona fide inconsistency between an affiant's averments and his deposition testimony" the sham affidavit doctrine applies to exclude the inconsistent statement in the post-deposition affidavit. *Kinser v. United Methodist Agency for the Retarded*, 613 F. App'x 209, 210 (4th Cir. 2015).  Although the sham affidavit doctrine has primarily been "applied where a party submits sworn testimony that contradicts the party's own sworn statements, it may also apply where a party submits contradictory evidence from non-party witnesses to defeat summary judgment." *Walker v. Carter*, 210 F. Supp. 3d 487, 502-03 (S.D.N.Y. 2016).  Indeed, in *Rohrbough*, the Fourth Circuit held that the district court was justified in excluding an affidavit by a non-party witness – namely, the plaintiff's expert witness. *See* 916 F.2d at 976.[21]

Sabrina Lewis, also a former USPTO employee, instigated her own discrimination complaint against the USPTO. *See* Lewis Declaration (Case caption); Lewis Deposition (Dkt. 54-6) (Case caption).[22]  In Lewis' EEOC deposition, Lewis was represented by the same counsel, Nathaniel D. Johnson, who represented Tankesley during her EEOC deposition and who is representing plaintiff in these proceedings. *Comp.* Lewis Deposition at 2 (noting Johnson

---

[21] Plaintiff's argument that the sham affidavit rule is limited to affidavits by parties fails for this reason.  Plaintiff himself recognizes in his supplemental brief that *Rohrbough* applied the sham affidavit rule to an expert witness and, thus, the Fourth Circuit has not limited the application of the rule in the way that plaintiff suggests. *See* Pl. Supp. Br. at 16.

[22] Although the first page of docket 54-6 reflects the caption of *this* case, the first page of the deposition transcript reflects the case caption of *Lewis' case*. *See* Dkt. 54-6 at 1-2.

appearing on behalf of Complainant Sabrina Lewis) *with* Tankesley Deposition at 2 (noting Johnson appearing on behalf of Complainant Anna Tankesley) *and* Civil Cover Sheet (Dkt. 2) (noting Johnson appearing on behalf of Plaintiff).[23] Moreover, Tankesley submitted Lewis' deposition and the Lewis Declaration in support of Tankesley's opposition to summary judgment before the EEOC.

Paragraph 15 of the Lewis Declaration specifically discusses Tankesley's supervisor, LaRita Jones, and Jones' alleged "pet names" for employees who suffered various disabilities. Because the sham affidavit doctrine applies only where the deposition testimony and a subsequent affidavit or declaration conflict, it is first necessary to set forth Lewis' deposition testimony and statements in the Lewis Declaration. In her deposition, Lewis was asked about "Operation Cockroach."

> Q:     And did you – Let's start with the first one, the "Cockroach."  Did you interpret that to be a comment about Ms. Tankesley's race?
>
> A:     No.  I knew what the "Cockroach" – or I felt I knew what the "Cockroach" was about.  That had – That was a reflection of the box incidents where Anna [Tankesley] had put some boxes out in the hallway.
> So LaRita – And, actually, I didn't know what "Cockroach" meant, and she said that when you have lots of boxes, they collect cockroaches – they attract cockroaches.  So that's where it came from.
>
> Q:     And why did you know that's what she was referring to when she said "Operation Cockroach?
>
> A.     When she said "Cockroach" and they started explaining the reasons for the particular names, I didn't understand what the "Cockroach" came from.
> It was because of the boxes, that when you have a bunch of boxes, they collect cockroaches pretty much.  She was upset with Anna [Tankesley] about the incident with [personal identifying information].

*See* Lewis Depo. Tr. at 46:12-47:13.  On direct examination, counsel for Lewis, and also counsel

---

[23] At oral argument, plaintiff argued that the sham affidavit doctrine was not implicated because Ms. Lewis was represented by different counsel.  *See* Dec. 9, 2022 Tr. at 14:7-14.  This argument is belied by the record in this case, which clearly demonstrates that Lewis, Tankesley, and Plaintiff all shared the same counsel: Mr. Johnson.

for Tankesley, asked Lewis whether she believed the name "Operation Cockroach" was tied to Tankesley's disability status and Lewis answered "yes" without further explanation. *See id.* at 367:18-368:9. In sum, Lewis' testimony at her deposition was that Jones told Lewis that the name "Cockroach" related to Tankesley leaving boxes in the hall which would attract cockroaches, but Lewis believed the name the was related to Tankesley's disability status.[24] In her declaration, by contrast, Lewis attests that Jones told Lewis that Tankesley was referred to a "Operation Cockroach" because Tankesley's "reasonable accommodation agreement [would make it as] hard to get rid of her as it is to rid homes of cockroaches." Lewis Decl. ¶ 15.

Here, there is a clear contradiction between Lewis' deposition testimony and Lewis' Declaration. In the deposition testimony, Operation Cockroach related to boxes of personal identifying information ("PII") left in a hallway, but in Lewis' Declaration the phrase relates to Tankesley's reasonable accommodation agreement. *Comp.* Lewis EEOC Depo Tr. at 47:3-13 *with* Lewis Decl. ¶ 15. Those two explanations cannot be reconciled, nor did Lewis' Declaration attempt to reconcile her vastly different explanations when she had the opportunity. Indeed, before the EEOC, plaintiff's counsel, Nathanial Johnson, conceded that the statements were inconsistent. *See* Complainant's Sur-Reply in Opp'n to Agency's Reply in EEOC Proceeding (Dkt. 56-5) (plaintiff's counsel notes the "stark inconsistencies in Ms. Lewis' sworn statements"). Given this, it strains credulity for plaintiff to argue now that "Ms. Lewis' April 2013 declaration does not conflict with her deposition testimony." Pl. Suppl. Br. at 29.

Contrary to plaintiff's suggestion that Lewis had no incentive to "'clean up' her testimony in her prior deposition," Pl. Suppl. Br. at 15, there is reason to suspect, as in *Rohrbough*, that

---

[24] Plaintiff cites to other portions of Lewis' deposition testimony regarding Lewis' reaction to "Operation Cockroach," but those deposition excerpts are not directly relevant to whether there is a contradiction between Lewis' deposition testimony and her declaration and so they are not repeated here. *See* Pl. Suppl. Br. at 18.

Lewis' Declaration "may not represent the considered [testimony] of [Lewis her]self, but rather an effort  on the part of the [counsel] to create an issue of fact."[25]  *Rohrbough*, 916 F.2d at 976. First, there would be an incentive to Lewis and her counsel to submit more favorable sworn testimony in her declaration to support Lewis' own claims against the USPTO.  Second, where Lewis, Tankesley, and plaintiff are all represented by the same counsel – Mr. Johnson – counsel and/or Lewis have an incentive to submit a declaration more favorable to Tankesley than the deposition testimony. This concern is especially prevalent where plaintiff's counsel submitted this very same declaration in opposition to the motion for summary judgment before the EEOC.

Given this, Lewis' declaration also cannot be charitably described as "provid[ing] details and lend[ing] context" as plaintiff argues.  Pl. Suppl. Br. at 24.  Lewis, when asked about "Operation Cockroach," gave an unambiguous answer: Operation Cockroach was about boxes of PII  in a hallway.  The contested portion of Lewis' declaration "puts forward a new" explanation. *See Riggins v. SSC Yanceyville Operating Co., LLC*, 800 F. App'x 151, 160 (4th Cir. 2020) (affirming the district court's decision to strike portions of an affidavit where the affidavit introduced a new explanation after unambiguous deposition testimony); *see also Jackson v. Consol. Coal Co., McElroy Mine*, 21 F.3d 422 (4th Cir. 1994) (Unpublished Opinion) (same). Thus, as in *Riggins*, Lewis only introduced this new explanation after the USPTO moved for summary judgment before the EEOC. *See Riggins*, 800 F. App'x at 160 (noting that "Dr. Rupe only introduced this new standard after Defendant moved for summary judgment, after Plaintiff's counsel failed to rehabilitate Dr. Rupe, and after Dr. Rupe declined to change her testimony). Accordingly, paragraph 15 of the Lewis Declaration cannot be considered at summary judgment.

---

[25] Although the purpose originally would have been to create an issue of fact at the summary judgment stage before the EEOC, the declaration serves the same purpose here where plaintiff is relying on two different versions of Lewis' testimony to create an issue of fact.

# IV.

The next step in the analysis is to determine the undisputed summary judgment record, as summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Rule 56, Fed. R. Civ. P. To this end, defendant, in compliance with Rule 56 and Local Rule 56, set forth a statement of material facts in separate enumerated paragraphs that defendant contends are undisputed and supported by record citations. The Rule next required plaintiff to respond to defendant's statement of undisputed fact by "listing all material facts" that are disputed with citations to the record. E.D. Va. L.R. 56(B). Plaintiff complied with this portion of the Rule. But, as discussed *supra*, where plaintiff relies on the Tankesley Affidavits, Declaration, or Emails, or paragraph 15 of the Lewis Declaration, that evidence will not be considered in determining whether a genuine dispute of fact exists. Additionally, where plaintiff has not disputed the facts asserted by defendant, those facts are deemed admitted. *See* E.D. Va. L.R. 56(B).

For his part, plaintiff did not *fully* comply with the Rules, however, because plaintiff also set forth a narrative of nine pages of his own "Statement of Material Facts in Dispute." Opp'n Br. at 7-16. Neither the Rules nor case authority permit this. *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 981 (E.D. Va. 2017). By setting forth an alternative, narrative statement of the facts, plaintiff has made it difficult for defendant to respond to plaintiff's alternative facts and plaintiff has made it "difficult to determine exactly which material facts are disputed." *Id.* (citing *Integrated Direct Marketing, LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015)).[26]

---

[26] Some of the asserted "Disputed Material Facts" by plaintiff are unsupported by any citation to the record or are supported by inadmissible evidence; for example, plaintiff cites no evidence to support the assertion that "Tankesley was always able to perform the essential duties of the HRS position with adequate guidance and training." Opp'n Br. at 8. Indeed, many of the assertions that plaintiff makes about Jones are unsupported by citations to the record. *See also* Opp'n Br. at 9 (discussing Jones' "visual antipathy"). Thus, where such asserted facts are unsupported by the record they are not taken into account. At other times, the portions of the record that plaintiff cites are not included in the record submitted in support of summary judgment. For example, plaintiff's opposition brief cites page 9 of Tankesley's 2017 Deposition, but page 9 is not included in the excerpts of depositions provided. *See* Opp'n Br. at 15 (citing page 9); Dkt. 54-2 (skipping from page 2 to 24). Other facts asserted by plaintiff in the Disputed Material

Accordingly, the following statement of facts is derived from a careful review of (i) defendant's statement of undisputed facts;[27] (ii) plaintiff's response, but excluding plaintiff's reliance on the Tankesley Affidavits, Declaration, or Emails or paragraph 15 of the Lewis Declaration;[28] and (iii) the summary judgment record as a whole. Given this, the undisputed facts are as follows:

1. Tankesley started working at the USPTO in 1991.

2. Prior to 2010, Tankesley worked in the Delegated Examining Unit ("DEU"), which required her to assist in the hiring of patent examiners to work in the USPTO. After working in DEU, Tankesley worked in Staffing and Classification under various supervisors, including Linda Dobbs. The DEU and Staffing and Classification have different operations and Tankesley performed different duties in each position.[29]

3. During the 2010 to 2011 time period, the USPTO Office of Human Resources ("OHR") was divided into several divisions. LaRita Jones became the chief of the Employment Division, Patents, in March 2010. She was Tankesley's second-line supervisor.[30] From

---

Facts are already encompassed by facts asserted by defendant and opposed by plaintiff; for example, plaintiff's assertion that Tankesley never received training, which is referenced with respect to several facts asserted by defendant and resolved below. Accordingly, it is unnecessary to repeat, as plaintiff does, facts discussed and analyzed in the context of defendant's asserted undisputed statement of facts. Finally, other "facts" asserted by plaintiff are conclusions that need not be credited at summary judgment. *See Wai Man Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1042 (4th Cir. 2020) (holding that employees' testimony was based on "conclusory allegations" which were "insufficient to withstand the summary judgment motion"); *Reese v. Meritor Automotive, Inc.*, 5 F. App'x 239, 244 (4th Cir. 2001) (holding that co-workers' general allegations of harassment insufficient to create a dispute of fact at summary judgment). Thus, conclusory allegations made by plaintiff and supported by Tankesley's conclusory testimony at deposition are insufficient to create a genuine issue of material fact and need not be addressed further. For example, plaintiff's allegations and Tankesley's deposition testimony that Jones began a course of intimidation, bullying, and threats are conclusory. *See* Tankesley 2017 Depo. Tr. at 120:7-10 ("[I]t was due to the bullying in the workplace, the harassment that I was receiving.").

[27] At times, this Memorandum Opinion will refer to specific undisputed facts asserted by defendant in its memorandum in support of summary judgment as "Def. SOF."

[28] Each of those contested facts has been examined to determine whether the record citations supplied by the parties support their positions, whether defendant's asserted undisputed facts should be modified in any way, and whether there is a genuine dispute of material fact.

[29] Plaintiff purports to dispute facts asserted by defendant regarding Tankesley's work for DEU and Staffing and Classification. But this is more properly framed as an attempt to add information regarding the differences between plaintiff's work in each unit. Accordingly, the asserted fact has been modified to reflect this additional information.

[30] Although plaintiff claims to dispute the undisputed facts asserted by defendant in Def. SOF 3 regarding Jones' position within OHR, none of the evidence that plaintiff cites relates in any way to defendant's asserted facts. Rather, plaintiff is attempting to add his own, unrelated fact that "Ms. Jones directed Ms. Tankesley's first-line supervisors Sabrina Lewis and Patricia Mendoza to take adverse action toward Ms. Tankesley." Opp'n Br. at 2. The deposition testimony cited by plaintiff does not support her asserted fact. *See* 2017 Tankesley Depo. at 161

2010-11, Jones was the second-line supervisor for seven GS-13 HR Specialists.

4. The Employment Division, Patents, was further divided into three branches: the External Hiring Branch, the Patents Branch, and the Outreach Branch. From 2010 to 2011, Mrs. Tankesley was a GS-13 HR Specialist assigned to the Patents Branch.

5. Sabrina Lewis became the Patents Branch Chief, and thus Tankesley's first-line supervisor, in August 2010.

6. Patricia Mendoza took over for Lewis on or around September 2011 and then became Tankesley's new first-line supervisor.

7. A GS-13 HR Specialist like Tankesley "provides expert level advice in the areas of recruitment, placement, position classification, and position management. Serves as a trouble-shooter, providing authoritative advice and guidance on problems not susceptible to treatment by accepted methods; recommendations and decisions are characterized by breadth and importance."[31]

8. Among other responsibilities, major duties of the position include: "manages the position classification and position management program for an assigned USPTO organizational area(s)"; "serves as a staff advisor to top management officials"; "collaborates with human resources staff, managers, and/or supervisors to develop courses of action to resolve complex issues, real or perceived situations"; "provides expert advice on policy, directives, and guidelines on a full range of matters pertinent

---

(admitting that it made sense for Tankesley to report telework tasks to her first-line supervisor, Lewis); *id.* at 168-69 (discussing that Lewis said she was trying to make Tankesley feel not smart); *id.* at 190 (referring to an unknown email apparently sent by Ms. Lewis); *id.* at 229-32 (admitting that Tankesley had no evidence that Jones directed Lewis to do something but stating that it was Tankesley's belief). Because the evidence cited by plaintiff is unrelated to the fact asserted by defendant and because the evidence cited by plaintiff does not support the fact asserted by plaintiff, there is no genuine dispute of material fact with respect to Def. SOF 3.

[31] Plaintiff disputes Def. SOF 7-10 regarding the duties of a GS-13 HR Specialist. To support its asserted facts, defendant cites defendant exhibit 7, which defendant asserts is the job description for a GS-13 HR Specialist. *See* Def. Exh. 7, Human Resource Specialist Position Description (Dkt. 51-1). Plaintiff first argues that the job description is unsigned and undated. It is unclear why a job description would be signed. Plaintiff also argues that defendant exhibit 7 was not presented to Tankesley and that her job description, as reflected by Exhibit 1 to the 2017 Tankesley Deposition, was "markedly different. Opp'n Br. at 3 n.2. Unfortunately, plaintiff did not attach the Exhibit 1 to the 2017 Tankesley Deposition, so it cannot be compared to defendant exhibit 7. Moreover, the deposition testimony to which plaintiff cites does not demonstrate that Tankesley had different job responsibilities than those contained in defendant exhibit 7. Indeed, in her deposition testimony Tankesley testified that "Recruitment and Placement" as reflected on Exhibit 1 to her deposition was her Staffing department. *See* 2017 Tankesley Depo. Tr. at 72-73. Defendant exhibit 7 also refers to the same "Recruitment and Placement" department. *See* Dkt. 51-1. Similarly, in her deposition, Tankesley reviewed a section called "Major Duties and Responsibilities" and confirmed that those duties reflected the duties that she performed. *See* 2017 Tankesley Depo. Tr. at 72-73. Defendant exhibit 7 also contains the title "Major Responsibilities and Duties." *See* Dkt. 51-1. Thus, on this record, without Exhibit 1 to the 2017 Tankesley Deposition (which plaintiff has not submitted), there appears to be no dispute between the job description included in defendant exhibit 7 and Tankesley's deposition testimony. Nor did plaintiff, in disputing defendant's asserted facts, suggest an alternative description of Tankesley's position. Accordingly, there is no genuine issue of material fact as to the duties of a GS-13 HR Specialist as asserted in Def. SOF 7-10.

to position classification, position management, recruitment, and placement"; and "prepares and presents reports and briefings on assigned organization/unit status and/or recommended actions to appropriate individuals."

9. The position requires "mastery" of several topic areas, like human resources principles, as well as "seasoned consultative skills sufficient to participate as a senior consultant for major agency components analytical methods and techniques."

10. A GS-13 HR specialist like Tankesley is expected work independently; as the position description explains, "[t]he employee determines the most appropriate principles, practices, practices, and methods to apply in all phases of assignments . . . ; frequently interprets regulations on his/her own initiative, applies new methods to resolve complex and/or intricate, controversial, or unprecedented issues and problems."

11. In 2010 and 2011, there was an initiative to hire over a thousand patent examiners at the USPTO. The hiring unit was understaffed at this time and there was pressure to process the over 28,000 applications that the USPTO had received.

12. Beginning in 2010, Lewis required Tankesley to submit weekly status reports to Lewis and to update Lewis in weekly one-on-one meetings.[32]

13. By fall of 2010, Tankesley professed that performing parts of her job had become "a problem." 2017 Tankesley Depo. Tr. at 62:2-6. She often complained that she lacked the training to hire employees, even though she had been a GS-13 HR Specialist for many years. But Tankesley was never denied the opportunity to take refresher courses that would have helped her to do her job.[33]

---

[32] Defendant's asserted undisputed fact states that Lewis required all HR Specialists to provide weekly status reports and to have one-on-one meetings. Plaintiff disputes the asserted fact first by noting that the cited record evidence does not support it. Plaintiff is correct in this regard. Although the two exhibits that defendant cites – emails from September and October – suggest that there was a plan to implement weekly status reports for all HR Specialists, it is unclear that there was a requirement in place that weekly status reports be submitted to Lewis. *See* Def. Exhs. 10 & 11, Dkt. 51-1 at 131, 133. In any event, even if the cited evidence did support defendant's asserted fact, Lewis' deposition testimony is clear that only Tankesley was required to submit status reports and attend one-on-one meetings. *See* Lewis 2017 Depo. Tr. at 75. Accordingly, plaintiff has demonstrated a genuine issue of fact with respect to whether all HR Specialists or only Tankesley were required to submit weekly status reports and attend one-on-one meetings and the asserted fact has been modified to reflect plaintiff's version as the non-moving party. Ultimately, this dispute of fact is not material.

It should also be noted that, although plaintiff cites the 2017 Tankesley EEOC Declaration to dispute defendant's asserted fact, it has not been relied on because it is inadmissible hearsay as discussed *supra*.

[33] Plaintiff disputes two parts of Def. SOF 14 by defendant: (i) the asserted fact that plaintiff "professed an inability to do her job" and (ii) the asserted fact that Tankesley was never denied an opportunity to take refresher training. Both parties cite the same portions, pages 62 through 67, of the 2017 Tankesley Deposition to support their positions. A close review of Tankesley's deposition testimony reveals that she never testified to an inability to perform her job, but she did testify that portions of her job had "become a problem." 2017 Tankesley Depo. Tr. at 62:2-6. Accordingly, the asserted fact has been modified to reflect more accurately the deposition testimony.

With respect to whether Tankesley was denied any refresher training, her testimony is clear. Tankesley was asked

22

14. Tankesley frequently asked other HR Specialists for assistance. For example, both Dublin Byars and David Russell, also GS-13 HR Specialists, helped Tankesley. At one point, USPTO managers asked Betty Carreiro, a GS-11 HR Specialist, to help Tankesley, which Carreiro did. Carreiro found that she had to explain things to Tankesley several times. At one point, Carreiro told managers that Tankesley was asking a lot of questions and taking up too much of Carreiro's time.[34]

15. Lewis also assigned Tankesley a mentor, Modena Gooley, who was an HR Contractor. Gooley assisted Tankesley on many occasions and did not fear criticism from management for helping Tankesley.[35]

16. Neither Jones nor Lewis told Tankesley that she could not receive help from others. No coworkers ever told Tankesley that Jones prohibited them from assisting Tankesley. Gooley, however, told Lewis that Jones instructed Gooley not to assist Tankesley.[36]

---

"were you ever denied the opportunity to take this kind of refresher course" and her answer was: "I don't believe that I was denied an opportunity as far as not being given an opportunity to go." 2017 Tankesley Depo. Tr. at 67:1-5. Accordingly, defendant's asserted fact, that Tankesley was not denied refresher training, accurately states the deposition testimony and there is no genuine dispute of material fact with respect to Def. SOF 14.

[34] Plaintiff attempts to dispute Def. SOF 15 in reliance on the 2017 Tankesley EEOC Declaration, which is inadmissible hearsay. Because the 2017 Tankesley EEOC Declaration cannot be relied upon at summary judgment, there is no genuine dispute of material fact with respect to the help that other HR Specialists provided to Tankesley.

[35] Plaintiff attempts to dispute that Gooley was a mentor to Tankesley as asserted in Def. SOF 16. Plaintiff first attempts to rely on the 2017 Tankesley Declaration, which is inadmissible hearsay and may not be relied upon to create disputed issues of fact. Next, plaintiff attempts to rely on Lewis' 2017 deposition testimony, but Lewis' testimony and Tankesley's testimony supports defendant's asserted facts that Gooley was assigned by Lewis to be Tankesley's mentor and fulfilled that function even when it was unpopular with Jones. *See* Tankesley 2017 Depo. Tr. at 97-98 (testifying that she met with Gooley several times to discuss job analysis); Lewis 2017 Depo. Tr. at 256:22-57:3 (testifying that Lewis assigned Gooley to mentor Tankesley). To the extent that Lewis' testimony contradicts Tankesley's testimony on the subject of whether Gooley actually provided assistance, it is clear that Lewis lacked personal knowledge about whether Gooley did in fact help Tankesley therefore cannot be used to create a dispute of fact. *See* Lewis 2017 Depo. Tr. at 257:9-13 (testifying as to what Gooley told Lewis that Gooley did). Accordingly, there is no genuine dispute of material fact that Gooley was assigned to mentor Tankesley and did help Tankesley, even when it was unpopular with Jones.

[36] Plaintiff attempts to dispute Def. SOF 17 that neither Jones nor Lewis told Tankesley that coworkers could not assist Tankesley with her work. Plaintiff notes that the deposition testimony cited by defendant does not support the asserted fact. In the Reply brief, defendant acknowledged that defendant included an incorrect citation and provided the correction citation. Because the 2013 Tankesley Deposition supports the asserted fact, there is no dispute of fact that neither Jones nor Lewis told Tankesley that that coworkers could not assist Tankesley with her work. *See* 2013 Tankesley Depo. Tr. at 61:13-19. Plaintiff also attempts to modify the asserted fact by suggesting that Jones did instruct coworkers not to work with Tankesley. In so doing, plaintiff relies on Lewis' testimony about what Gooley told Lewis what Jones said to Gooley. *See* Lewis Depo. Tr. at 255-56; Lewis 2011 Aff. at 4-5 (Dkt. 54-8). The parties did not address whether Lewis' testimony is inadmissible hearsay. Although at first glance such statements would appear to be hearsay, the Fourth Circuit has recognized that an employee's statements may constitute an admission of a party opponent pursuant to Rule 801(d)(2)(D), Fed. R. Evid., where the statement was made by the employee concerning a matter within the scope of the employment and made during the existence of the employment relationship. *See Sutton v. Roth, LLC*, 361 F. App'x 543, 548 (4th Cir. 2010) (holding that statement by McDonald's employee was an admission by a party opponent). Here, Gooley is reporting to Lewis, her supervisor, that Jones – Lewis' supervisor – gave Gooley instructions that countermanded Lewis' instructions.

17. Tankesley believed that her coworkers were fearful of management seeing them talk to her and believed that her colleagues would talk more loudly to her than others so that management could hear what was discussed.[37]

18. In December 2006, Tankesley was diagnosed with Stage IV Metastatic Breast Cancer. By 2008 and during the relevant 2010-2011 time period, her cancer was in remission.[38]

19. In 2009, while working under Linda Dobbs, Tankesley obtained a reasonable accommodation from the USPTO due to the neuropathy stemming from her cancer treatments. That accommodation was still in place when Tankesley was in the Patents Branch in 2010. Pursuant to the accommodation, Tankesley was permitted

    a. To work from home for 41 hours per biweekly period;

    b. To work on an Increased Flextime Policy work schedule, which allows full-time employees to work their regular 80 hours in less than 10 full workdays; and

    c. To use a computer monitor when she worked at home.

20. On October 14, 2010, Tankesley emailed Jones that she was "not feeling well" and wanted to flex (*i.e.* to make up the time later in the biweekly period). Tankesley emailed Jones because Lewis, her direct supervisor, was off that day. Tankesley did not indicate that she was sick because of her disability. Jones replied that she would prefer that Tankesley take leave. Tankesley did not tell Jones that she had a reasonable accommodation stating that she could flex her time.

21. After this exchange with Jones, Tankesley requested a meeting to clarify the scope of her accommodations. Tankesley, Lewis, and Jones met with Sally Oh, an EEO Specialist, in October 2010. The meeting clarified Tankesley's accommodation and no changes were made to the accommodation. Tankesley viewed Jones as angry with the result of the meeting.[39]

Thus, this conversation would appear to fall within the Rule 802(d)(2)(D) hearsay exception as employee statements regarding a matter within the scope of their employment made during their employment. Accordingly, it is appropriate to add the additional fact that Gooley informed Lewis that Jones instructed Gooley not to assist Tankesley.

[37] Plaintiff disputes Def. SOF 18 as unsupported by the cited portion of the record. In the Reply, defendant conceded that there was an error in the citation and provided the correct citation and excerpt of the 2013 Tankesley Deposition. Because the correctly cited deposition testimony supports the asserted fact, there is no genuine dispute of material fact with respect to Def. SOF 18.

[38] Plaintiff seeks to clarify that during the 2010-2011 relevant period Tankesley's cancer was in remission. It is appropriate to add that during the 2010-2011 relevant period Tankesley's cancer was in remission with respect to Def. SOF 19 because plaintiff cannot dispute the asserted fact, that by 2008 Tankesley was in remission. *See* 2017 Tankesley Depo. Tr. at 113:17-19 (testifying that her cancer went into remission in 2008).

[39] Although plaintiff asserts that he partially disputes Def. SOF 22 that the meeting clarified Tankesley's reasonable

24

22. After that meeting, Tankesley did not have any specific problems with her reasonable accommodation and the October 14, 2010 date was the only date that Jones asked Tankesley to take leave instead of using flex time.

23. During the holiday season in 2010, Tankesley requested two weeks of leave. Some of this leave included "use or lose" leave, which Tankesley had to use before the end of the year. Tankesley's previous supervisor had approved this request earlier in 2010.

24. In November 2010, Lewis, who was then responsible for approving Tankesley's leave, expressed concern that Tankesley had waited until the end of the year to use her use or lose leave. At the time Lewis made her comments, however, Lewise was unaware that Tankesley's two weeks of leave had already been approved.

25. Once Lewis learned that the two weeks of leave had already been approved, Lewis told Tankesley that it was not a problem for Tankesley to take the full two weeks of leave and that Tankesley could use the leave as previously requested.

26. Tankesley nevertheless decided to change her leave. She perceived Lewis as mad at Tankesley because Tankesley viewed Lewis' writing in the email as bigger than usual.

27. After Tankesley changed her leave, Lewis told Tankesley that she wanted to make sure that Tankesley's change in leave did not cause Tankesley any hardship. Tankesley thanked Lewis and told Lewis that she "fe[lt] better now (smile)" about the leave situation. *See* Def. Exh. 20, November 22, 2010 Tankesley Email (Dkt. 51-2). Tankesley never spoke directly with Jones about this leave request.[40]

28. In January 2011, Tankesley requested three days of annual leave to care for her husband following a surgery.[41]

29. In response to Tankesley's leave request, Lewis asked Tankesley to clarify the date of her husband's surgery, to provide medical documentation, and to provide a report on work assignments. Lewis believed that she was required to ask for documentation for absences over three days. In fact, Lewis was mistaken, and that policy only applied to

---

accommodation, plaintiff does not actually state that he disputes the fact asserted. Rather, plaintiff attempts to add that Jones was "furious about having to meet with Ms. Oh, and left the meeting angrily." Opp'n Br. at 4. Accordingly, there is no genuine dispute of material fact with respect to Def. SOF 22, but the additional information that Tankesley perceived Jones as angry is included.

[40] Plaintiff asserts that he disputes the portion of Def. SOF 28 stating that Tankesley never spoke directly with Jones about this leave request. But Plaintiff's argument makes clear that he agrees with the asserted fact, as plaintiff states: "Mrs. Tankesley did not speak directly to Jones through Lewis." Opp'n Br. at 11. Accordingly, there is no genuine dispute of material fact that Tankesley did not speak directly to Jones.

[41] Plaintiff seeks to clarify in Def. SOF 29 that the leave that Tankesley sought annual leave rather than sick leave. The fact asserted by defendant only refers to "leave" rather than a specific type of leave. Accordingly, there is no genuine dispute of material fact with respect to Def. SOF 29, but it is appropriate to clarify that Tankesley requested annual leave rather than sick leave.

requests for sick leave.[42]

30. Ultimately, Tankesley voluntarily modified her leave request to seek only one day of leave. Based on the modified request, Lewis told Tankesley she did not need to provide medical documentation.

31. When Jones first assumed her role, Tankesley was sharing an office with a federal contractor. On or around February 23, 2011, Tankesley asked Lewis for a private office. Tankesley never asked Jones for a private office; she only asked Jones at one point to reconfigure the office that Tankesley was in at the time.[43]

32. Tankesley was not the only GS-13 HR Specialist who did not have a private office. In March 2011, Tankesley discussed her lack of private office with Lisa Dill, in the EEO. Thereafter, Dill met with Lewis and Jones and informed them that they could not deny Tankesley a private office.[44] Tankesley's officemate left the USPTO on March 8, 2011, and thereafter Tankesley had the office to herself. Tankesley did not have a problem sharing the office.[45]

33. In February 2011, Jones discovered four boxes labeled "Trash" with Tankesley's name on them sitting outside of Tankesley's office. Jones then discovered that the information in the boxes contained personally identifiable information ("PII").[46]

---

[42] With respect to Def. SOF 30, plaintiff again asserts that Tankesley was requesting annual leave, for which medical documentation is not required and cites to the applicable Leave Administration Policy. This does not dispute Lewis' belief, as reflected in her email and as asserted by defendant in the undisputed fact, that medical documentation was necessary. *See* Def. Exh. 23, Tankesley/Lewis January 2011 Email Chain (Dkt. 51-2). Accordingly, there is no genuine dispute of material fact with respect to Def. SOF 30, but the asserted fact has been modified to reflect the additional information asserted by plaintiff.

[43] Plaintiff disputes that Tankesley shared her office with a federal contractor as asserted in Def. SOF 32. The interrogatory responses cited by defendant to support the asserted fact list Vanessa Griffin as the federal contractor with whom Tankesley shared her office. Plaintiff, to support his alleged dispute, cites to pages 135-137 of the 2017 Tankesley Deposition; however, plaintiff did not include those pages of the deposition transcript in the evidence submitted. *See* 2017 Tankesley Deposition, Dkt. 54-3 (transcript jumps from page 134 to page 140). Importantly, page 140 of the attached deposition transcript does refer to Tankesley sharing an office with Griffin. Accordingly, there is no genuine dispute of fact regarding whether Tankesley shared her office with a federal contractor.

[44] The complaint to Lisa Dill and Lisa Dill's meeting with Jones and Lewis are not part of defendant's statement of undisputed facts or plaintiff's response. Plaintiff included the asserted facts in plaintiff's narrative statement of facts and cited to Lewis' deposition testimony. *See* Opp'n Br. at 13 (citing Lewis Depo. Tr. at 356-69, 369-70). Defendant then relied on this information in defendant's reply brief. *See* Reply at 13 (listing the March 2011 meeting as one of plaintiff's protected activities). Accordingly, the information is included in the statement of facts as undisputed because both parties appear to rely on the information.

[45] Plaintiff attempts to dispute Def. SOF 33 that Tankesley was not the only GS-13 HR Specialist who did not have a private office, by noting that several other GS-13 HR Specialists *did* have private offices. But that information does not dispute the asserted fact, that Tankesley was not alone in not have a private office. Indeed, as the other, undisputed, facts suggest, after March 2011 Tankesley did have a private office. Accordingly, there is no genuine dispute of material fact that Tankesley was not the only GS-13 HR Specialist who did not have a private office.

[46] Plaintiff attempts to dispute Def. SOF 34 that Jones discovered boxes containing PII by asserting, without citation:

34. Pursuant to USPTO policy, PII in physical form must be secured and cannot be left unattended in public spaces.[47]

35. Lewis wrote to Karen Dean, Employee Relations Specialist, to ask for assistance in determining an appropriate course of action to discipline Tankesley for failing to protect PII from improper use or disclosure. Dean worked with Lewis, the management official responsible for proposing disciplinary action, to determine an appropriate disciplinary action.

36. Dean recommended a proposed three-day suspension based on the egregiousness of the misconduct and in consultation with Dean's supervisor, who was familiar with the consistency of penalties for such misconduct.

37. Dean and Lewis wrote a notice of proposed suspension, and Lewis issued it on March 9, 2011. The notice proposed a three-day suspension. Tankesley responded to the notice of the proposed suspension in writing.

38. On September 26, 2011, Jones declined to impose a suspension and issued a letter of reprimand instead. Jones reduced the penalty because Tankesley had been out of the office and Jones did not think a suspension was appropriate in that circumstance.

39. On March 22, 2011, Tankesley began the process of requesting Family Medical Leave Act ("FMLA") leave.

40. Employee Relations told Tankesley she needed a physician certification to receive FMLA leave. Dean worked with Tankesley to get the required certification, as well as additional information required to approve Tankesley's FMLA.

41. Tankesley was approved for FMLA leave beginning in March 24, 2011 through the end of August 2011.

42. For the time when Tankesley was on FMLA leave, Dean advised Tankesley that she

---

"Defendant neither produced the boxes' contents nor an inventory of their contents. No PII was observable." Opp'n Br. at 5. Plaintiff further asserts that other people had PII visible on their desks or the copy machine. But that also does not appropriately dispute defendant's asserted undisputed fact that Tankesley left PII material in the hallway. Indeed, in the deposition testimony cited by plaintiff, Tankesley seemingly admits that she left PII material in the hallway. *See* 2017 Tankesley Depo. Tr. at 354:19-20 ("Her response to my PII was over the top."). Other deposition testimony cited by plaintiff also establishes that Tankesley moved boxes containing PII information into the public hallway. *See id.* at 347-48 (admitting that "Vanessa and I" moved the boxes into the hallway and that two of the boxes contained PII). Accordingly, there is no genuine dispute of material fact with respect to Def. SOF 34 that Jones discovered boxes in the hall with Tankesley's name on them containing PII.

[47] Plaintiff disputes Def. SOF 35 that "PII in physical form must be secured and cannot be left unattended in public spaces." Opp'n Br. at 5. To support the asserted undisputed fact, defendant relies on a July 2010 email discussing protection of PII material. *See* July 2011 Email Forwarding July 2010 Email (Dkt. 51-2). In that email, HR Systems Branch Chief Colleen A. Sheehan states that employees much "Secure, lock up or shred PII when in physical form – lock offices, file cabinets, etc. to restrict access to data with PII information." *Id.* Accordingly, because the evidence cited by defendant supports Def. SOF 35 and because plaintiff cites no contrary evidence, there is no genuine dispute of material fact that PII in physical form must be secured.

could use leave without pay ("LWOP"), accrued sick leave, accrued annual leave, or any combination of the three. Dean also advised Tankesley that she could be eligible for the leave donation program.

43. Tankesley did not have enough annual leave and sick leave to be paid for the entire FMLA leave period. She requested 240 hours of advanced sick leave from Lewis and Jones to continue receiving a paycheck during her FMLA leave.

44. Karen Karlinchak, the director of the OHR, was the only individual who could approve the request for advanced sick leave.

45. Karlinchak initially denied the request for advanced sick leave. After Karlinchak reviewed the information that Tankesley submitted to Lewis (which Karlinchak had not previously seen), however, Karlinchak approved Tankesley's leave request in full. Therefore, Tankesley was approved for advanced sick leave through August 31, 2011, and was expected to return to work on September 1, 2011.

46. Jones received documentation for Tankesley that indicated that she would return to work on August 1, 2011 and Jones approved Tankesley's return to work on August 1, 2011. After being informed of the anticipated August 1, 2011 return date, Tankesley informed Jones on that this was an error and provided additional documentation on July 18, 2011.[48]

47. Tankesley had provided additional documentation to Lewis that demonstrated that Tankesley's return-to-work date was September 1, 2011. But Lewis was also on extended leave and Jones did not initially see that documentation. On July 21, 2011, once Jones saw the additional documentation, which Tankesley also provided in the July 18, 2011 email, Jones approved Tankesley's September 1, 2011 return to work. [49]

---

[48] Plaintiff attempts to dispute Def. SOF 47 that Jones received documentation indicating that Tankesley's return to work date was August 1, 2011. Plaintiff and defendant rely on the same July 2011 exchange of emails to support their positions. *See* Def. Exh. 41, July 2011 Jones/Tankesley Email Exchange (Dkt. 51-3). In the emails, it is clear that Jones reviewed documentation which suggested that Tankesley was supposed to return on August 1, 2011. *See id.* ("I have reviewed your Web TA and conclude the following ... [your] return to the office [is] August 1, 2011."). Tankesley then responds with attachments that establish that her leave "leave was approved for the time frame in question (February 10, 2011 thru [sic] August 31, 2011)." *Id.* Accordingly, there is no dispute of fact that Jones reviewed documentation suggesting that Tankesley's return to work was August 1, 2011 and that Tankesley subsequently provided documentation demonstrating that Tankesley's return to work was September 1, 2011. Def. SOF 47 has thus been modified to take into account the additional information asserted by plaintiff, but there is no genuine dispute of material fact.

[49] Plaintiff attempts to dispute Def. SOF 48 by noting that Tankesley informed Jones on July 12, 2011 and July 18, 2011 that Tankesley was on approved leave until August 31, 2011. This is not a real dispute with the facts asserted by defendant, that Tankesley originally provided additional documentation to Lewis who was then on leave and that upon receiving the additional documentation Jones approved the leave. Rather, plaintiff appears to seek to add or modify the asserted facts to make clear that Tankesley provided the additional documentation to Jones on July 18, 2011. Accordingly, there is no genuine dispute of a material fact with respect to Def. SOF 48, but the asserted facts will be modified to reflect that Tankesley provided the additional documentation to Jones on July 18, 2011 and that Jones approved the extended leave on July 21, 2011.

48. All employees who are on extended leave are advised in writing that if they do not return to work on the anticipated return date, they could be charged as absent without leave ("AWOL") and could ultimately be removed from federal service on that basis. This is standard language in every letter.[50]

49. On July 21, 2011, Jones sent such a letter to Tankesley, indicating that she expected Tankesley would return to work on September 1, 2011 and that, if Tankesley did not return to work, she may be marked absent without leave.[51]

50. After Tankesley returned to the USPTO in September 2011 following her extended leave, Jones assigned Tankesley to work on special projects.[52]

51. Jones assigned Tankesley to special projects because she had been on extended leave and Jones determined that it was best to ease her back into the office workflow. Jones

---

[50] Plaintiff attempts to dispute Def. SOF 49 that every employee on extended leave is advised in writing that if they do not return to work they could be viewed as absent and removed from federal service. Plaintiff cites no record evidence in support of his position and merely argues that there is no evidence that similar letters were sent to other employees. Defendant cites to the affidavit of Dean, the Employee Relations Specialist, who stated: "All employees who are on extended leave are advised in writing that if they do not return to work on the day expected, they could be charged Absent Without Leave (AWOL) and ultimately they could be removed from Federal service. This is standard language . . . ." Def. Exh. 28 at 4, December 6, 2011 Affidavit of Karen Dean (Dkt. 51-2). Because defendant cites record evidence that supports the asserted fact and because plaintiff has cited no evidence in support of his attempt to dispute the asserted fact, there is no genuine dispute of material fact with respect to Def. SOF 49 that letters to employees on extended leave routinely inform those employees of the potential consequences of not returning to work.

[51] Plaintiff attempts to dispute Def. SOF 50 that Jones sent a standard letter to Tankesley informing Tankesley of her return to work date and reciting the language regarding absence without leave. But plaintiff merely argues: "Jones sent two e-mails (July 12 and 21, 2021 [sic]) to Ms. Tankesley threatening her job status." Opp'n Br. at 6. To begin with, nothing in the July 12, 2011 email to Tankesley could be construed as threatening Tankesley's job. That email states:

I hope you are doing well. I recently viewed your Web TA and conclude the following:
As of PP13, you have exhausted the full 480 hours of your FMLA entitlement and have exhausted the 240 advanced sick leave that has been approved. Since your documentation supports your absence until July 31, 2011, we are expecting you to return to the office August 1, 2011. In the meantime, we will apply any and all leave that you may accrue and any leave donations that you receive. If you have any questions, you can contact me or Karen Dean on 571.272.0787. Again, I hope you are feeling better soon.

Def. Exh. 42, July 2011 Jones/Tankesley Email Exchange (Dkt. 51-3). The July 21, 2011 email from Jones contains the standard language set forth regarding absence without leave. Accordingly, there is no genuine dispute of material fact with respect to Def. SOF 50 and the asserted fact that Jones sent a standard letter to Tankesley regarding her return to work.

[52] Although the parties did not specifically define special projects, Jones defined special projects as a "generic term used to describe miscellaneous work that needs to be done." Def. Exh. 9, ¶ 2, Oct. 20, 2022 Jones Declaration (Dkt. 51-1). Jones further identified examples of special projects to include working on cross-divisional teams, developing standard operating procedures, and preparing new policies. *See id.* This description comports with Tankesley's own description that "[s]pecial projects are listed in your position description as part of your position description," 2013 Tankesley Depo. Tr. at 11:20-22, and her description of special projects included working on recruitment incentive programs as well as whatever else a supervisor would assign, *see id.* at 9:3-15.

thought it would be unfair to an employee to return to their previous work without some acclimation period. In this case, it was an especially busy period for the office because the office was attempting to hire over 1,500 patent examiners and had well over 28,000 applications for all of the GS-13 HR Specialists to process. Jones felt that throwing Tankesley back into hiring immediately upon her return would not have been a good way to acclimate Tankesley back to her position.[53]

52. Accordingly, Jones assigned Tankesley to special projects as meaningful work for a short period of time to help her acclimate. In October 2011, Jones assigned additional responsibilities to Tankesley, but kept special projects as part of Tankesley's work portfolio.[54]

53. Being assigned to special projects did not change Tankesley's work conditions, her pay, or her grade of employment. In fact, being assigned to special projects made Tankesley feel special.[55]

54. Nor was Tankesley the only GS-13 HR Specialist assigned to special projects. Dublin Byars, an employee with no disability who had not engaged in any EEO protected

---

[53] Plaintiff attempts to dispute Def. SOF 52 regarding the reasons that Jones assigned Tankesley to special projects by arguing that Jones never explained her reasoning to Tankesley. To begin with, that Jones did not inform Tankesley of Jones' reasoning does not adequately dispute that the asserted facts represents Jones' reasoning, as is reflected in Jones' declaration. *See* Def. Exh. 9, ¶ 5, Oct. 20, 2022 Jones Declaration (Dkt. 51-1). Moreover, plaintiff attempts to dispute the asserted fact by relying on the 2017 Tankesley Declaration and the 2011 Tankesley EEO Affidavit which, as discussed *supra*, are inadmissible hearsay. Accordingly, there is no genuine dispute of material fact with respect to Def. SOF 52 and the reasons that Jones assigned Tankesley to special projects.

[54] Plaintiff attempts to dispute Def. SOF 53 that the projects that Tankesley were assigned involved meaningful work. The deposition testimony that plaintiff cites to dispute the asserted fact does not address, however, whether the work in special projects was meaningful. Rather, the deposition testimony discusses that multiple people were assigned to some of the same projects as Tankesley. *See* 2017 Tankesley Depo. Tr. at 174-177 (discussing how Tankesley asked why Jones would assign Tankesley to a project that someone else was also working on). Plaintiff also cites the 2017 Tankesley Declaration to support his position, but, as discussed *supra*, that declaration is inadmissible hearsay and may not be relied upon at summary judgment. Because the deposition testimony cited by plaintiff does not contradict the asserted fact, there is no genuine dispute of material fact regarding whether there was meaningful work involved with special projects.

[55] Plaintiff attempts to dispute Def. SOF 54 that being assigned to special projects did not change plaintiff's working conditions. First, plaintiff asserts that being assigned to special projects diminished plaintiff's status because she was denied an area of specialty. This argument is not supported by the deposition testimony cited; instead, Tankesley's deposition testimony merely states: "Instead of putting me back into the staffing field and the hiring field and that stuff, they brought me back on special projects." 2017 Tankesley Depo. Tr. at 176:22-177:2. This does not suggest that Tankesley had a diminished status. Second, plaintiff asserts that Tankesley was not permitted to complete the projects on which she worked. This assertion is supported by the deposition testimony but is unrelated to the asserted fact. Finally, plaintiff asserts that Tankesley was isolated and ostracized because of her assignment to special projects. This is not supported by the cited deposition testimony. *See* 2017 Tankesley Depo. Tr. at 174-177. Plaintiff also cites the 2017 Tankesley Declaration in support of his claim that Tankesley was isolated and ostracized but, as discussed *supra*, the 2017 Tankesley Declaration is inadmissible hearsay and may not be relied up at summary judgment. Accordingly, there is no genuine dispute of material fact about that the assignment to special projects did not change Tankesley's working conditions.

activity, was also assigned to special projects.[56]

55. Moreover, working on special projects under Jones was not the first time that Tankesley had been assigned to special projects; Tankesley also worked on special projects under Dobbs from 2007 to 2010.

56. Jones never said anything to Tankesley about Tankesley's disability outside of asking Tankesley if she had considered disability retirement. Rather, Tankesley perceived that Jones harbored discriminatory animus against Tankesley because of Jones' body language.[57]

57. While Tankesley believed that the so-called operation cockroach was a derogatory reference to Tankesley's disability, it was a reference to the potential for the unattended boxes containing PII to attract bugs. Jones never made the comment about cockroaches to Tankesley or in her presence.[58]

---

[56] Plaintiff attempts to dispute Def. SOF 55 that Byars was assigned to special projects by noting that Tankesley was not permitted to complete her projects. *See* Opp'n Br. at 6.  This does not dispute the asserted undisputed fact and the deposition testimony does not reflect whether Byars was permitted to complete his special projects. Accordingly, there is no genuine dispute of material fact that Byars was also assigned to special projects.

[57] Plaintiff attempts to dispute Def. SOF 57 that Jones never said anything to Tankesley about Tankesley's disability by noting that Tankesley also had conversations with Lewis about Jones' alleged discriminatory animus. To begin with, plaintiff relies on paragraph 15 of the Lewis Declaration, which, as discussed *supra*, is a sham affidavit and cannot be relied upon at summary judgment. But plaintiff also relies on Tankesley's and Lewis' deposition testimony. Although plaintiff did not include the initial portion of the deposition testimony referring to "Operation Cockroach," plaintiff cites a portion of Tankesley's 2017 deposition where Tankesley relays what Lewis told Tankesley that Jones told Lewis.  As courts consistently recognize within the employment law context, this testimony is hearsay and does not fall within the Rule 801(d)(2)(D) exception because the statement is not made as part of the employment relatiosnhip. *See Williams v. United States*, 852 F. App'x 378, 383 (10th Cir. 2021) (holding that "Doneghy's out-of-court statement repeating another out-of-court statement by Keller, as related in Williams' deposition," was hearsay where statement was that supervisor "wanted you gone"); *Kurincic v. Stein, Inc.*, 30 F. App'x 420, 424-425 (6th Cir. 2002) (holding that, although statement by supervisor that he wanted to "get rid of old employees" might not be considered hearsay, "it became hearsay when repeated" through one employee to the plaintiff); *see also Stephens v. Erickson*, 569 F.3d 779, 793-94 (7th Cir. 2009) (holding that statements by administrative assistant regarding what a commissioner said was outside the scope of her employment and inadmissible hearsay). Plaintiff also cites Lewis' deposition testimony, but Lewis' deposition testimony does not contradict the asserted fact that Jones never said anything to Tankesley about Tankesley's disability. Lewis' deposition testimony was that Operation Cockroach related to the boxes containing PII because "when you have a bunch of boxes, they collect cockroaches pretty much," but that Lewis believed it was tied to disability status. Lewis Depo. Tr. at 47:3-13; *id.* at 368:7-9 (stating Lewis' belief). Lewis' affidavit also does not contradict the asserted fact that Jones never said anything to Tankesley about Tankesley's disability, but recounts that Jones told *Lewis*, that Jones felt Tankesley's reasonable accommodation was the "key to the candy store." Lewis Aff. at 3. Accordingly, there is no genuine dispute of material fact regarding Def. SOF 57 that Jones never said anything to Tankesley about Tankesley's disability status.

[58] Plaintiff attempts to dispute Def. SOF 58 that Operation or Project Cockroach was a reference to Tankesley's disability, but the evidence on which he relies does not support the dispute.  First, plaintiff relies on Lewis' deposition testimony which, contrary to plaintiff's position, supports the assertion that Operation Cockroach was a reference to unattended boxes attracting bugs. *See* Lewis Depo. Tr. at 47:3-13 (testifying that Operation Cockroach was based on the idea that "when you have a bunch of boxes, they collect cockroaches pretty much"). Second, plaintiff relies on paragraph 15 of the Lewis Declaration.  As noted *supra*, paragraph 15 of the Lewis Declaration is

58. Outside of Jones' one reference to whether Tankesley had considered disability retirement, Jones, Lewis, and Mendoza (Tankesley's other supervisor) never said anything negative to Tankesley regarding Tankesley's disability or Tankesley's EEO case.[59]

59. Around October 2011, Tankesley requested a detail or reassignment. The detail was outside of OHR and not within Jones' chain of command.

60. Though Tankesley initially accepted the detail, she ultimately declined it because she assumed that her new supervisor would harass her due to Jones' supposed influence.[60]

61. In 2013, Tankesley transferred to Trademarks and Corporate Branch, which was not under Jones' chain of command.

62. Jones never put Tankesley on a performance improvement plan, gave her any performance warning, or threatened to fire her.

63. Tankesley first contacted the EEO office on March 1, 2011. Tankesley alleged that she was discriminated against based on her age, race, and disability when she:

   a.   received the Notice of Proposed Suspension on March 9, 2011;

   b.   was denied a private office on February 23, 2011;

   c.   was forced to forfeit 20 hours of use or lose annual leave in December 2010, which was, in Tankesley's words, "to accommodate her supervisor to avoid not being considered a 'team player'"; and

   d.   not effectively trained in her essential job duties from October 2010 onwards.

64. On May 26, 2011, the EEO officer issued a letter advising Tankesley of her right to file a formal complaint.

65. Tankesley filed a formal complaint on June 8, 2011 alleging a hostile work

___

a sham affidavit and cannot be relied upon at summary judgment to create a dispute of fact. Accordingly, because no record evidence supports plaintiff's position, there is no genuine dispute of material fact that Operation Cockroach was a reference to the PII boxes attracting cockroaches.

[59] Plaintiff does not dispute Def. SOF 59 fact that Jones, Lewis, and Mendoza did not say anything negative about Tankesley's disability or EEO case. Rather, plaintiff seeks to reiterate the previously stated fact that Jones once mentioned disability retirement. That fact has been added. Accordingly, there is no genuine dispute of material fact that Jones, Lewis, and Mendoza did not say anything negative about Tankesley's disability or EEO case.

[60] Plaintiff attempts to dispute Def. SOF 61 that Tankesley declined the detail because she feared Jones' influence would lead to harassment on the detail by asserting that "Tankesley was concerned that Wellington would be influenced by Jones and that Jones would continue to harass her." Opp'n Br. at 7. This is stating the same information in a slightly different format. Accordingly, there is no genuine dispute of asserted fact that Tankesley declined the detail because she feared she feared Jones' influence would lead to harassment on the detail.

environment.   The complaint was amended several times to include claims of discrimination and retaliation.

66. On April 1, 2012, Tankesley requested a hearing before the EEOC administrative judge ("AJ").   On October 18, 2016, the AJ issued an order that allowed the parties to complete discovery.

67. The USPTO filed for summary judgment in the EEOC case and Tankesley opposed. After reviewing the record, the AJ granted the USPTO's motion for summary judgment.

68. Tankesley appealed to the EEOC's Office of Federal Operations ("OFO").   On March 11, 2021, the OFO affirmed the AJ's decision.

69. On April 2, 2021, Tankesley passed away.

70. Carl Tankesley, acting as personal representative of the Estate of Anna Tankesley, then filed this case on Tankesley's behalf in the District of Columbia.   The original complaint contained nine counts, alleging retaliation, discrimination, and a hostile work environment based on age, disability, and protected activity.

71. The case was transferred to this District, because the USPTO is headquartered in Alexandria.

72. After argument and briefing on two motions dismiss, the only surviving claims were disability discrimination, retaliation based on disability based protected activities, and a disability-based and retaliatory hostile work environment.

## V.

Next, the analysis turns to whether summary judgment is appropriate for plaintiff's claim of disability discrimination pursuant to the Rehabilitation Act in Count I of his Complaint.   The Rehabilitation Act "prohibits discrimination on the basis of disability in employment decisions by the Federal Government." *Lane v. Pena*, 518 U.S. 187, 193 (1996).   As with other civil rights statutes, a plaintiff can proceed either by way of direct evidence or circumstantial evidence following the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[61]   *See Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001) (noting that

---

[61] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (establishing a framework whereby: (1) the plaintiff establishes a *prima facie* case, then (2) the defendant must offer a legitimate, nondiscriminatory reason for the action taken, and then (3) the plaintiff must show that the offered explanation is pretextual).

Rehabilitation Act claims are analyzed using the "standards applied under the Americans with Disabilities Act" (ADA)). Generally, to establish a *prima facie* case of discrimination under the Rehabilitation Act plaintiff must show: (i) that Tankesley was disabled; (ii) that Tankesley was otherwise qualified for her position; and (iii) that Tankesley suffered "an adverse employment action solely on the basis of her disability." *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). The third element is where a Rehabilitation Act claim differs from the ADA, because the Rehabilitation Act requires that a plaintiff must show that the adverse employment action was "solely by reason of" the disability. *Halpern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454, 462 (4th Cir. 2012). If plaintiff establishes a *prima facie* case, then the burden shifts to defendant to provide a legitimate, nondiscriminatory reason for its conduct. *See Hannah P.*, 916 F.3d at 342. If defendant provides such a reason, then plaintiff must demonstrate that the proffered reason was a pretext for discrimination. *See id.*

Here, defendant argues that plaintiff cannot establish a *prima facie* case of discrimination because Tankesley did not suffer an adverse employment action when Tankesley was temporarily reassigned to special projects[62] and, even if she did, Jones – Tankesley's supervisor – did not act solely on the basis of Tankesley's disability. Defendant further argues that it has offered a legitimate non-discriminatory reason for its conduct and that plaintiff cannot establish pretext. Because defendant is correct with respect to each of these arguments, the motion for summary judgment must be granted on Count I with respect to plaintiff's disability discrimination claim.

---

[62] As discussed in the Order on the motion to dismiss, the only alleged adverse action that survived the motion to dismiss was the potential adverse action of reassigning Tankesley to special projects because the other alleged adverse actions do not constitute a significant change in employment status. *See Order*, dated June 17, 2022 at 5-7.

### 1. No Direct Evidence of Discrimination

In his opposition brief, plaintiff argues that this case should proceed directly to the pretext analysis because there is direct evidence of discrimination: namely, Jones' comments to Lewis regarding "Operation Cockroach" and the "keys to the candy store."  To establish direct evidence of discrimination, a plaintiff must produce "direct evidence of a stated purpose to discriminate." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988).  More specifically, the Fourth Circuit has explained that "[w]hat is required is evidence of conduct or statements that *both* reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) (emphasis added). As district courts applying this standard have made clear, "[e]ven if an apparently discriminatory statement exists, it does not create direct evidence of discrimination unless it has a nexus with the employment decision." *Martin v. Scott & Stringfellow, Inc.*, 643 F. Supp. 2d 770, 782 (E.D. Va. 2009).  Neither comment relied on by plaintiff meets this standard.

To begin with, the undisputed summary judgment record based on admissible evidence establishes that Operation Cockroach was a comment made in reference to the boxes of PII that Tankesley left in public view in a hallway and not in reference to Tankelsy's disability . *See* Lewis Depo. Tr. at 47:3-13 (testifying that Operation Cockroach related to the boxes containing PII because "when you have a bunch of boxes, they collect cockroaches pretty much").[63]  Moreover, even to the extent a discriminatory animus can be attributed to the Operation Cockroach and keys to the candy store comments, they were made months in advance of Tankesley's September 2011

---

[63] Plaintiff's argument and rhetoric is drawn from the discriminatory animus attached to Jones' statement in paragraph 15 of Lewis' Declaration. As discussed *infra*, plaintiff presents Lewis' Declaration as a mere "clarification" of Lewis' prior deposition testimony.  But the picture presented by plaintiff's counsel here – who was also Lewis' counsel – is one that not even plaintiff's counsel believes to be true.  *See* Complainant's Sur-Reply in Opp'n to Agency's Reply in EEOC Proceeding (Dkt. 56-5) (plaintiff's counsel notes the "stark inconsistencies in Ms. Lewis' sworn statements").  Thus, paragraph 15 of Lewis' Declaration falls squarely within the proscriptions of the sham affidavit doctrine and cannot be relied upon – nor should it be. *See Rohrbough*, 916 F.2d 970, 975.

reassignment to special projects. The record does not make clear when the alleged "keys to the candy store" remark was made; contextually, however, it would make sense for the statement to have been made following the October 2010 meeting with Oh to clarify the reasonable accommodation. *See* Def. Exh. 18, Sally Oh Aff. at 2 (Dkt. 51-2). Similarly, the Operation Cockroach remark was made relatively close in time to the March 2011 PII incident.[64] Thus, plaintiff has failed to point to any direct link between these months-earlier alleged statements and Tankesley's September 2011 temporary reassignment to special projects. As the Fourth Circuit has instructed, "[s]uch isolated remarks unrelated to the challenged employment decision are insufficient to provide direct evidence of discrimination." *Finkle v. Howard Cnty.*, 640 F.App'x 245, 248 (4th Cir. 2016). Accordingly, plaintiff has failed to establish direct evidence of discrimination and must instead rely on the *McDonnell-Douglas* burden-shifting framework to establish a *prima facie* case of discrimination.

### 2. Adverse Employment Action

Next, plaintiff asserts that Tankesley's temporary reassignment to special projects: (i) "eviscerated Ms. Tankesley's job responsibilities" by reducing her to performing menial work; and (ii) "affected her status and prestige in the workplace." Opp'n Br. at 17-18. Plaintiff's argument is unsupported by the record and therefore summary judgment must enter in favor of defendant on Count I.

The Fourth Circuit has recognized that a reassignment "can only form the basis of a valid [discrimination] claim if the plaintiff can show that the reassignment had some detrimental effect."

---

[64] The only record evidence that appears to attach a timeframe to the Operation Cockroach statement is the inadmissible paragraph 15 of the Lewis Declaration, which states that it was made in April 2011. *See* Lewis Decl. ¶ 15. So even crediting the explanation given for the remark by this sham affidavit, the remark was not made close in time to the reassignment to special projects.

*Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999).  Thus, the Fourth Circuit has held that "absent some decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action." *Id.*  Plaintiff has not established that Tankesley's temporary reassignment to special projects had such a detrimental effect.

To begin with, the undisputed factual record establishes that Tankesley's reassignment to special projects was temporary.  Indeed, it lasted only six weeks, as the undisputed factual record establishes that Tankesley was assigned to special projects in September 2011 and that, in October 2011, Jones overhauled the assignments of all HR Specialists and expanded Tankesley's role beyond special projects.  *See* Def. Exh. 43, Oct. 12, 2011 Email from Jones (Dkt. 51-3); PEX 19, October 7, 2011 Patents Branch Assignments Chart (Dkt 54-22).  District courts within the Fourth Circuit have consistently recognized that such temporary reassignments, as Tankesley experienced here, do not constitute adverse employment actions.[65]

Additionally, the undisputed factual record with respect to Tankesley's reassignment is: (i) that the temporary reassignment to special projects did not change Tankesley's pay or grade of employment; (ii) that Tankesley had been working on special projects in some capacity since 2007, *see* 2017 Tankesley Depo. Tr. at 50-52 (testifying that, in 2007, "I was actually working on special projects"); (iii) that Tankesley was not the only employee assigned to special projects, *see* PEX 19, Dkt. 54-22 (showing Dublin Byars also worked on special projects); (iv) that working on

---

[65] *See, e.g., Haggins v. Sam's E., Inc.*, No. 3:13-cv-1596-MBS, 2015 WL 5781390, at *8 (D.S.C. Sept. 30, 2015) ("Temporary changes to assigned tasks or workload are not adverse employment actions."); *Taylor v. Burwell*, No. PWG-13-1998, 2014 WL 3547337, at *6 (D. Md. July 16, 2014) ("Courts regularly have found that temporary changes to an employee's workload or to the tasks he is assigned do not constitute an adverse employment action"); *Balinao v. Gonzales*, No. 9:06-cv-0254-PMD-GCK, 2007 WL 5307975, at *8 (D.S.C. Aug. 16, 2007), *aff'd sub nom. Balinao v. Mukasey*, 270 F. App'x 260 (4th Cir. 2008) (stating that "[a] temporary assignment of undesirable duties does not constitute an adverse employment action" (internal quotation marks and citation omitted)).

special projects was part of Tankesley's job description, *see* 2013 Tankesley Depo. Tr. at 11:20-22 ("[s]pecial projects are listed in your position description as part of your position description."); (v) that Tankesley enjoyed working on special projects, *see* Def. Exh. 44, Carl Tankesley Depo. Tr. at 53:9-13 (testifying that Tankesley "enjoyed" special projects and that "it made her feel special"); and (vi) that working on special projects involved meaningful work, *see* Jones Decl. at 1, ¶2; (Dkt. 51-3). Although plaintiff claims that Tankesley's job responsibilities were undesirable, plaintiff does not cite to any admissible, record evidence to support that claim. Indeed, Tankesley's deposition testimony would appear to contradict those claims. *See* 2017 Tankesley Depo. Tr. at 89:14-18 ("When I was working on a special project for Ms. Jones . . . she made me the lead on [a] project . . . ."). Thus, the admissible record evidence at summary judgment does not establish that Tankesley's temporary reassignment to special projects was an adverse employment action.

This case closely resembles *Edmonson v. Potter*, 118 F. App'x 726 (4th Cir. 2004). In *Edmonson*, the plaintiff worked for the United States Postal Service (the "USPS") as a mail-processing clerk when she presented USPS with evidence of her carpel tunnel syndrome. *See id.* at 729. Thereafter, the plaintiff was transferred to the "re-wrap section" which she alleged was an adverse employment action because her duties and skill were limited and she had a "lack of instruction and assignment and sat with no work to do." *Id.* The Fourth Circuit held that the *Edmonson* plaintiff failed to establish an adverse employment action because her transfer did not result in "any decrease in salary, benefits, or rank" and there was no evidence that the changes "to her work schedule or duties damaged her future career prospects." *Id.* Importantly, the Fourth Circuit held that the plaintiff's claims of loss of status and dissatisfaction with assignments, similar to those made by Tankesley here, were not actionable. *Id.; see also Cunningham v. Nordisk*, 615 F. App'x 97 (3d Cir. 2015) (holding that a supervisor's reassignment of a pharmaceutical employee

38

to clinical trials in an effort to ease the employee's return to work following FMLA leave was not an adverse employment action).

Thus, applying *Edmonson* to the facts here, plaintiff has failed to establish that Tankesley's temporary reassignment to special projects was an adverse employment action because, based on the record, it involved no decrease in pay, benefits, or rank, and was part of her job description and part of the work that she had performed since 2007. Tankesley's dissatisfaction with how Jones supervised Tankesley's special projects and Tankesley's perceived loss of status are not sufficient to convert this into an actionable reassignment. Accordingly, summary judgment must enter on plaintiff's discrimination claim in favor of defendant.

### 3. Causation

Assuming, *arguendo*, that Tankesley's reassignment qualifies as an adverse employment action (which it does not), plaintiff cannot demonstrate that Jones acted solely with discriminatory intent when Tankesley was temporarily assigned to special projects. *Halpern*, 669 F.3d at 462 Plaintiff relies primarily on two of Jones' statements to evidence discriminatory intent. First, plaintiff relies on Jones' statement regarding Operation Cockroach, but as the summary judgment record reflects, that statement referred to Tankesley leaving boxes of PII in the hallway and was unrelated to Tankesley's disability.[66] Second, plaintiff relies on Jones' alleged statement that Tankesley's reasonable accommodation was so broad as to give Tankesley the "keys to the candy

---

[66] Plaintiff attempts to avoid Lewis' clear testimony as to what Jones' said by focusing instead on what Lewis felt Jones meant. This is not sufficient to create a genuine issue of fact at summary judgment. Lewis' deposition testimony is clear that Jones told Lewis: "It was because of the boxes, that when you have a bunch of boxes, they collect cockroaches pretty much. She was upset with Anna about the incident with PII." Lewis Depo. Tr. at 47:3-3. In contrast to this clear testimony of Jones' explanation, plaintiff attempts to rely on Lewis' subjective belief that Operation Cockroach was tied to Tankesley's disability status. *See* Lewis Depo. Tr. at 368:7-9. As the Fourth Circuit has explained, a witness's subjective opinions are insufficient to establish an inference of discrimination. *See Christian v. S.C. Dep't of Labor Licensing & Regulation*, 651 F. App'x 158, 165 (4th Cir. 2016); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (stating that testimony from coworkers regarding whether a plaintiff deserved treatment "is close to irrelevant").

39

store." At a minimum, this statement appears to express frustration with the breadth of Tankesley's reasonable accommodation, but the statement appears to have been made in October 2010 – although the precise timeframe is unclear – well before Tankesley's September 2011 reassignment. Importantly, the Operation Cockroach and candy store comments were not made to Tankesley. The only potential statement made to Tankesley over this year-long time frame was Jones' question regarding whether Tankesley had considered disability retirement, apparently in 2010.[67] As courts have recognized, "a question from an employer about an individual's age and retirement plans is 'a textbook example of an isolated remark which demonstrates nothing.'" *EEOC v. Delta Chem. Corp.*, 2008 WL 4833098, at *5 (D. Md. Nov. 3, 2005) (citing *Shorette v. Rite Aid of Me., Inc.*, 155 F.3d 8, 13 (1st Cir. 1998)).   Importantly, Tankesley testified that "Ms. Jones never verbally said anything to me about my disability."  2017 Tankesley Depo. Tr. at 172.  These two stray remarks appear to have been made almost a year before Tankesley's reassignment and therefore do not create an inference that Jones acted solely based on disability animus.

The only statement by Jones regarding why she temporarily reassigned Tankesley comes not from any of Jones' comments at the time, but in her declaration in this case.  In Jones' declaration, Jones states that she determined that it was appropriate to "ease [Tankesley] back into the office" and that she believed it "was unfair to an employee to return them to their previous work responsibilities absent some acclimation period." Jones Decl. at 1, ¶ 5.  A close read of this statement demonstrates that Jones' decision was not based on Tankesley's disability but on her long absence from work. *See Silk v. Bd. Of Trustees, Moraine Valley Comty. College, Dist. No.*

---

[67] Although the entire question is not included in the excerpted deposition transcripts, it appears that Tankesley was asked whether Jones said something negative about Tankesley's disability in a meeting in 2010 as the year "2010" is carries over from the prior page. *See* 2017 Tankesley Depo. Tr. at 24.  Neither plaintiff nor defendant included page 23 of the deposition transcript.

*524*, 795 F.3d 698, (7th Cir. 2015) (affirming district court's grant of summary judgment based on reassignment of courses where the decision-maker "regarded Silk as *absent* during the relevant period – not as suffering from a disability"(emphasis added)).[68] Indeed, perhaps recognizing this distinction, plaintiff does not even argue that this statement evidences any animus.

Much of plaintiff's argument regarding discriminatory animus based on disability relies solely on Tankesley's perception of Jones' actions.   In her deposition, Tankesley acknowledged that many of her interactions with Jones would, to an outside observer, appear neutral, but that Tankesley perceived a sinister intent in such conduct.   *See* 2017 Tankesley Depo. Tr. at 91 (testifying that Jones' conduct "to you would look like this is just normal, to me, I know what she's saying"); *id.* at 153 ("Ms. Jones let me know in so many non-verbal ways that she was not happy with me").   Courts of appeals have recognized that Tankesley's personal beliefs and perception of Jones' motivations for neutral conduct cannot establish causation or to satisfy a nonmovant's burden on summary judgment.[69]   Thus, even assuming that plaintiff established an adverse employment action (which he did not), plaintiff's *prima facie* case fails because plaintiff cannot establish causation.   Accordingly, summary judgment must enter in favor of defendant on plaintiff's disability discrimination claim.

### 4. Pretext

Even assuming plaintiff has set forth a *prima facie* case of disability discrimination (which

---

[68] Plaintiff did not assert any claim based on the FMLA, but courts have also recognized the utility of permitting a "less stressful" return to work in that context. *See Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 943 (3rd Cir. 2007) (recognizing utility of "gradual resumption of workload and an environment [plaintiff] would find less stressful" even where such restrictions were not medically necessary); *Cunningham*, 615 F. App'x at 100.

[69] *See Lyles v. Texas Alcohol Beverage Comm'n*, 379 F.App'x 380, 384 (5th Cir. 2010) (holding that a plaintiff's "own beliefs regarding [the decisionmaker's] opinions of [plaintiff] . . . cannot import racial animus into [the decisionmaker's] individual conduct"); *Brown v. Progress Energy*, 364 F. App'x 556, 558 (11th Cir. 2010) (holding that "subjective perception and speculation rather than specific facts" are not sufficient to establish causation).

he has not), plaintiff cannot establish that defendant's proffered legitimate, nondiscriminatory reason for Tankesley's temporary reassignment to special projects was pretextual. Jones explained that she wanted to "ease [Tankesley] back into the office workflow" after her extended leave, because Jones found it unfair to an employee "to return to their previous work responsibilities without some acclimation period." Jones Decl. at 1, ¶ 5. Jones found that particularly apt here, where "it was an especially busy period in the office" with "well over 28,000 applications" to process. *Id.*

Plaintiff's entire argument on pretext is three sentences, which essentially argue, without citation to the factual record, that "Jones harbored deep-seated animus toward Plaintiff [sic] [and] that such animus bore directly on the adverse actions taken against Ms. Tankesley." Opp'n Br. at 28. Plaintiff's cursory argument is insufficient to avoid summary judgment. *See Vannoy v. Fed. Res. Bank of Richmond*, 827 F.3d 296, 305 (4th Cir. 2016) (holding that "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons" and that a claims fails where a plaintiff "makes no evidentiary showing" of pretext). Moreover, the factual record does not support that Jones' decision was pretextual. To begin with, Jones' declaration is uncontradicted. Plaintiff points to no other evidence in the record relating directly to Tankesley's reassignment. Indeed, plaintiff's own arguments are that Tankesley took FMLA leave because she experienced paranoia and stress and because she was "unable to work and suffered a mental breakdown." Opp'n Br. at 14 & n. 23. Caselaw reveals that many employees in that situation seek the very accommodation that Jones provided.[70] Jones' statement reveals that *any* employee who returned to work would find such a

---

[70] *See, e.g., Rausch v. Alta Cima Corp.*, 2023 WL 2227727 (W.D. Va. Feb. 24, 2023) (plaintiff argued failure-to-accommodate claim based on the employer's alleged failure to permit plaintiff to "ease [her] way back into working").

situation stressful and that, regardless of whether that employee had a disability, she would ease their return to work to ensure that they are able to acclimate back to their responsibilities. *See Iwanejko*, 249 F. App'x at 943 (recognizing utility of "gradual resumption of workload and an environment [plaintiff] would find less stressful" even where such restrictions were not medically necessary). Accordingly, plaintiff has not demonstrated that disability-based animus was even a motivating factor, let alone the sole factor as required under the Rehabilitation Act, for Tankesley's temporary reassignment to special projects.

*    *    *

In sum, plaintiff has failed to show either direct evidence of disability discrimination or a *prima facie* case of disability discrimination under the Rehabilitation Act. On this summary judgment record, plaintiff cannot show that Tankesley suffered an adverse employment action or that Tankesley's temporary reassignment to special projects was based solely on disability animus. Indeed, even assuming arguendo that plaintiff could make out a *prima facie* case of discrimination (which he cannot), plaintiff has not attempted to make an argument regarding pretext beyond his own conclusory assertions. Accordingly, summary judgment must enter in favor of defendant on plaintiff's disability discrimination claim (Count I).

VI.

As with plaintiff's disability discrimination claim, a retaliation claim may be proved by direct evidence or plaintiff may rely instead on the *McDonnell-Douglas* burden shifting framework. Here, plaintiff argues both evidentiary theories in support of his retaliation claim. As with plaintiff's discrimination claim, plaintiff fails to establish either direct evidence or a *prima facie* case of retaliation. Thus, summary judgment must enter in favor of defendant on Count II.

43

A. <u>No Direct Evidence of Retaliation</u>

As discussed previously, direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x. 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*)). Plaintiff fails to produce any evidence of discriminatory animus that bears decision on any alleged materially adverse action.[71]

To begin with, plaintiff argues "there is direct evidence of retaliatory animus embodied in Jones' Operation Cockroach comment and her professed intent to rid herself of Ms. Tankesley." Opp'n Br. at 22. Again, in support of this argument, plaintiff relies on inadmissible evidence, namely paragraph 15 of the Lewis Declaration. *See id.* Yet, the admissible evidence in the record is devoid of any evidence of retaliation. Specifically, Lewis' deposition testimony makes clear Jones was not motivated by any retaliatory intent, but instead Jones Operation Cockroach comment related to boxes of PII left in a public hallway. *See* Lewis Depo. Tr. at 47:3-13 (testifying that Operation Cockroach related to the boxes containing PII because "when you have a bunch of boxes, they collect cockroaches pretty much"). And, the other evidence that plaintiff cites, namely Lewis' 2011 EEO Affidavit and Lewis' deposition testimony, does not support that Jones had professed her intent to eliminate Tankesley. Rather, Lewis believed, based on Jones conduct, that this was the case. *See* Lewis 2011 EEO Aff. at 5 (stating her belief that Jones did not want Lewis to tell Tankesley the purpose of a meeting because Jones "was trying to catch [Tankesley] off guard . . . [to] give Ms. Jones another reason to try to prove that Ms. Tankesley didn't know what

---

[71] As the Fourth Circuit has explained, there is "a less demanding heuristic for retaliation claims" whereby plaintiff's need only show "material adversity" or conduct that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 213 (4th Cir. 2022).

she was doing because the only way she could get ride of her was thru [sic] performance"). Lewis' speculation regarding Jones' motives is irrelevant. *See Christian*, 651 F. App'x at 165 (noting that a witness's subjective beliefs about the reasons for treatment of a co-worker do not carry any more weight than the plaintiff's assertion that the conduct was discriminatorily motivated); *DeJarnette*, 133 F.3d at 299. Thus, the two pieces of evidence on which plaintiff primarily relies on as his direct evidence are not clearly derogatory.

More importantly, plaintiff fails to connect any of Jones' remarks to any protected activities. *See Johnson v. UPS, Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (noting that for a statement to constitute "direct evidence" it must reflect a retaliatory attitude and bear directly on the contested employment decision). Plaintiff does not explain to which protected activity these purportedly retaliatory remarks relate nor does plaintiff explain what contested employment decision those remarks directly bore upon. Plaintiff's conclusory argument that there is direct evidence of retaliation, made in only one sentence of his brief, is insufficient to establish genuine issues of material fact. *See Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir.1988) (stating that plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of material fact"). Because plaintiff has produced no evidence directly linking these alleged statements to any materially adverse action, his retaliation claim cannot survive summary judgment based on direct evidence of discrimination. Accordingly, plaintiff's retaliation claim survives only if he makes out a *prima facie* claim of retaliation under the *McDonnell-Douglas* burden shifting scheme.

### B. No Circumstantial Evidence of Retaliation

Plaintiff next seeks to establish a *prima facie* case of retaliation. To establish a *prima facie* retaliation claim under the Rehabilitation Act, plaintiff must adduce evidence of the following: (1)

45

engagement in activity protected by the Rehabilitation Act; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse action. *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018); *Laing v. Federal Express Corp.*, 703 F.3d 713, 718 (4th Cir. 2013). As the Fourth Circuit has instructed, a plaintiff need not show an adverse employment action for a retaliation claim, but must demonstrate that the challenged action is "materially adverse" and would have "dissuaded a reasonable work from making or supporting a charge of discrimination." *Caldwell v. Johnson*, 289 F. App'x 579, 588 (4th Cir. 2008). The Fourth Circuit recently confirmed that the "materially adverse" standard applies "to private and federal employees alike." *Laurent-Workman*, 54 F.4th at 215.

### 1. Protected Activities

To begin with, it is important to discuss what conduct by Tankesley qualifies as a protected activity for purposes of the Rehabilitation Act. The parties agree that Tankesley engaged in three protected activities of which Jones had knowledge: (i) the October 2010 meeting with Tankesley, Jones, and Oh to discuss Tankesley's reasonable accommodation; (ii) a March 2011 complaint to Dill and subsequent meeting regarding Tankesley's office; and (iii) Tankesley's March 2011 EEO Complaint. *See* Opp'n Br. at 25; Reply at 13.

Plaintiff also points to two additional acts that he asserts qualify as protected activities: (i) Tankesley's initiation of FMLA leave on March 24, 2011; and (ii) Tankesley's June 23, 2011 formal EEO complaint. *See* Opp'n Br. at 25. Neither of these activities can support plaintiff's retaliation claim. To begin with, the Fourth Circuit has recognized that retaliation claims under the various anti-discrimination statutes "do not cross-pollinate," meaning that a retaliation claim brought pursuant to a specific anti-discrimination statute must be based on a protected activity under that statute. *Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 153 (4th Cir. 2020). Like

46

the Fourth Circuit, other courts have rejected the argument that an individual's exercise of FMLA

rights can form the basis for an retaliation claim under the Americans with Disabilities Act or the

Rehabilitation Act. *See Evans v. Cooperative Response Ctr., Inc.*, 996 F.3d 539, 548 (8th Cir.

2021) ("We reject Evan's implicit assertion that unlawful FMLA retaliation is necessarily unlawful

ADA retaliation.").[72] For that reason, plaintiff's use of FMLA leave cannot constitute a protected

activity for purposes of the Rehabilitation Act.  Nor does the June 2011 EEO Complaint qualify

as a protected activity in these circumstances. As defendant correctly notes, plaintiff points to no

evidence in the record that Jones had knowledge of Tankesley's June 2011 formal EEO complaint.

*See* Opp'n Br. at 24 ("Irrespective of whether Jones knew directly that Ms. Tankesley had . . . filed

her formal EEO complaint in June 2011 . . .").[73] Importantly, the Fourth Circuit has "consistently

required proof of a decisionmaker's knowledge of a protected activity" to support a retaliation

claim, which requires that a "plaintiff demonstrate that the decisionmaker imposing the adverse

action have *actual knowledge* of the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998

F.3d 111, 125 (4th Cir. 2021).  Specifically, plaintiff's burden requires more than "mere curious

timing." *Id.* (citing *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017)).  Here, plaintiff

points to no record evidence that Jones had knowledge of Tankesley's June 2011 formal EEO

---

[72] *See also* Acker v. General Motors, LLC, 853 F.3d 784, 791 (5th Cir. 2017) ("[A] request for FMLA leave is not a request for a reasonable accommodation under the ADA."); *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 (7th Cir. 2015) (holding that plaintiff's "periodic requests for his own health-related leave . . . without more, does not qualify as 'protected activity' under the ADA"); *Kastrati v. Progress of Peoples Mgmt. Corp.*, 2020 WL 6940991, at *5 (E.D.N.Y. Nov. 24, 2020) ("A request for FMLA leave, without more, cannot constitute a protected activity for the purposes of an ADA retaliation claim."); *Sowers v. Bassett Furniture Indus., Inc.*, 2021 WL 276169, at *7 n.7 (W.D. Va. 2021) ("Sowers says his request for FMLA leave was a protected activity, which it is under FMLA, but requesting FMLA is not a protected activity under the ADA."); *c.f. Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) ("Filing a workers' compensation claim is not something that is covered by the ADA, but rather by retaliation provisions under state law.").

[73] Plaintiff cites to Tankesley's deposition testimony and Lewis' deposition testimony to imply that Jones did have knowledge, but neither deposition addresses Tankesley's June 2011 formal EEO complaint, and Tankesley's 2017 Declaration, which is also cited, is inadmissible. *See* Opp'n Br. at 24 (citing deposition testimony and Tankesley 2017 Declaration).

complaint and it therefore cannot establish the basis for plaintiff's *prima facie* case of retaliation. Accordingly, plaintiff cannot rely on either Tankesley's request for FMLA leave or her June 2011 formal EEO complaint to support plaintiff's claim of retaliation under the Rehabilitation Act. The only protected activities at issue are therefore: (i) the October 27, 2010 meeting; (ii) the March 1, 2011 meeting; and (iii) the March 1, 2011 complaint.

## 2. Materially Adverse Actions

Although the June 17, 2022 Order on the motion to dismiss limited plaintiff's claims of an adverse employment action to Tankesley's reassignment to special projects, the Order explained that plaintiff's retaliation claim could rely on "continuing retaliatory conduct and animus." June 17, 2022 Order at 11 (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)). This is largely due to the less stringent materially adverse action standard applicable to a retaliation claim. *See Laurent-Workman*, 54 F.4th at 215.

Plaintiff lists numerous purported materially adverse actions suffered by Tankesley, *see* Opp'n Br. at 24-26; however, as discussed below, many of those alleged actions are not supported by the record and none of those actions is materially adverse. To begin with, plaintiff relies on only inadmissible evidence to support his claim: (i) that Jones questioned Tankesley's mental state, which relies only on the inadmissible 2017 Tankesley Declaration; and (ii) that Jones assigned unreasonable deadlines without guidance, which cites the inadmissible 2017 Tankesley Declaration and the 2011 Tankesley EEO Affidavit. Because these documents are inadmissible, they cannot be relied upon to create a genuine issue of material fact. *See Md. Highways Contractors Ass'n, Inc*, 933 F.2d at 1251 (holding that "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment"). Plaintiff also cites *no* evidence

for his allegation that Jones enforced Tankesley's ostracism by her co-workers[74] or that, on May 3, 2011, Jones denied a request for advanced sick leave. *See* Opp'n Br. at 25-26. Indeed, the undisputed summary judgment record is that it was *Karen Karlinchak* who initially disapproved of Tankesley's advanced sick leave request – not Jones. *See* Def. Exh. 28, Dean Aff. (Dkt. 51-2). Plaintiff's claim that Tankesley was evicted from her office is also unsupported by the record, as plaintiff's claim relies on inadmissible evidence and deposition testimony from Lewis that does not support that Tankesley was evicted from any office space. *See* Opp'n Br. at 25 (citing the 2017 Tankesley Declaration and the Lewis Depo. Tr. at 356-59, 369-70 (referring to Tankesley not being provided a private office)). Again, the undisputed facts in this case are that, as of March 2011, Tankesley had a private office because the contractor with whom she previously shared an office left the USPTO. *See* 2017 Tankesley Depo. Tr. at 139-40. Because the undisputed factual record on summary judgment does not support that these purported materially adverse took place, they cannot establish plaintiff's *prima facie* case.

Other alleged conduct by Jones does not meet the standard of being materially adverse. For example, the increased scrutiny in the form of required status reports and one-on-one meetings do not meet the materially adverse standard.[75] And, the undisputed facts establish that Tankesley

---

[74] The only other time in the opposition brief that plaintiff refers to "ostracism" by Tankesley's co-workers the cited evidence also does not support plaintiff's claims. *See* Opp'n Br. at 14, n22. There, plaintiff again cites the inadmissible 2011 Tankesley EEO Affidavit and also cites to portions of Tankesley's deposition discussing Jones' reaction to the PII incident, but not referencing any repeated efforts to ostracize Tankesley. *See id.* (citing 2011 Tankesley EEO Affidavit at 17 and 2017 Tankesley Depo. Tr. at 339-354). Additionally, the undisputed factual record on summary judgment is that no one ever told Tankesley that Jones told them not to work with Tankesley and indeed, Tankesley's deposition testimony was that Jones instructed *all GS-13 employees* that they were expected to work on their own. *See* 2013 Tankesley Depo. Tr. at 60-61. Moreover, even if plaintiff could show that Tankesley's co-workers ostracized her, "feelings of ostracism 'do not meet the retaliation standard of being materially adverse.'" *Ofoche v. Apogee Med. Grp. Of Va., P.C.*, 2018 WL 4512076, at *6 (W.D. Va. Sept. 20, 2018); *see also McKinney v. G4S Govt. Solutions, Inc.*, 711 F. App'x 130, 138 (4th Cir. 2017).

[75] *See Belton v. City of Charlotte*, 175 F. App'x 641, 658 (4th Cir. 2006) (holding that allegations of "close scrutiny" of equipment requests "cannot sustain" a retaliation claim); *Holley v. N.C. Dept. of Admin., N.C.*, 846 F. Supp. 2d 416, 442 (E.D.N.C. 2012) (holding that "allegedly heightened scrutiny of an employee's work product, without more, does not constitute a materially adverse employment action"); *Staggers v. Becerra*, No. ELH-21-231, 2021

received assistance and some mentorship from colleagues (namely, Carreiro and Gooley).[76]  In any event, courts of appeals have recognized that "failing to mentor" is not a materially adverse action.  *See AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014).  Moreover, Tankesley was an experienced employee and, although plaintiff asserts that other employees received mentorship when they were moved to Tankesley's unit, plaintiff fails to provide evidence that those persons were similarly situated to Tankesley.[77]  *See also People v. Primo Elec. Co., Inc.*, 2007 WL 9780466, at *11 (D. Md. Apr. 12, 2007) (holding no discrimination where plaintiff failed to present evidence that experienced employees were assigned mentors).  Thus, this conduct – the status reports, meetings, and failure to assign a mentor – do not establish a materially adverse action.

Next, plaintiff argues that Tankesley's temporary reassignment to special projects constituted a materially adverse action. The Supreme Court has instructed that a "reassignment of job duties is not automatically actionable" and must be assessed in "the circumstances of a particular case."  *Burlington N. & Sante Fe Ry. Co v. White*, 548 U.S. 53, 71 (2006).  Here, Tankesley's temporarily assignment to special projects did not change Tankesley's work conditions, her pay, or her grade of employment.  Special projects constituted "[o]ne of the regular work portfolios in the Workforce Employment Division." Def. Exh. 9, Jones Decl. at 1, ¶ 2 (Dkt.

---

WL 5989212, at *23 (D. Md. Dec. 17, 2021) (dismissing retaliation claim based on a requirement that the plaintiff provide status reports five times each day because those allegations represented only "petty slights or minor annoyances" and not any meaningful injury or harm).

[76] As the record establishes, Betty Carreiro was asked to provide assistance to Tankesley and reviewed information with her. *See* Def. Exh. 16, Betty Carreiro Affidavit (Dkt. 51-1).  Moreover, Gooley was assigned by Lewis to be Tankesley's mentor and fulfilled that function.  *See* Tankesley 2017 Depo. Tr. at 97-98 (testifying that she met with Gooley several times to discuss job analysis); Lewis 2017 Depo. Tr. at 256:22-57:3 (testifying that Lewis assigned Gooley to mentor Tankesley).

[77] Plaintiff mentions that Lewis, Karen Jackson, and Lanett Williams at some point received mentors.  *See* Opp'n Br. at 10.  The cited deposition testimony gives no information about the assignment of mentors to those employees and who made the decision. *See* 2017 Tankesley Depo. Tr. at 76 (testifying "I'm not sure how I know that information. I just know she had a mentor.").

51-1).[78] Indeed, Tankesley had been assigned to special projects in some capacity since 2007. *See* 2017 Tankesley Depo. Tr. at 50-52 (testifying that, in 2007, "I was actually working on special projects"). Additionally, the undisputed factual record demonstrates that special projects involved meaningful work that Tankesley enjoyed. *See* Jones Decl. at 1, ¶2; Def. Exh. 44, Carl Tankesley Depo. Tr. at 53:9-13 (testifying that Tankesley "enjoyed" special projects and that "it made her feel special") (Dkt. 51-3). Moreover, Tankesley's reassignment to work exclusively on special projects lasted only six weeks, because in October 2011 Jones overhauled the assignments of all HR Specialists. *See* Def. Exh. 43, Oct. 12, 2011 Jones Email (Dkt. 51-3). Courts have recognized that similar temporary reassignments are not materially adverse.[79] Thus, Tankesley's temporary reassignment to special projects does not constitute an adverse action.

Indeed, plaintiff appears to recognize that the temporary reassignment to special projects itself is insufficient to prove retaliation; instead, plaintiff attempts to rescue his retaliation claim by arguing that Jones interfered with Tankesley's assignments. *See* Opp'n Br. at 23, n.39 (conceding that special projects involved meaningful work but arguing that Jones frustrated and interfered with that work). Although Tankesley's deposition testimony claims that Jones interfered with every project that Tankesley worked on,[80] plaintiff cites only two examples: (i) where Jones instructed Tankesley to gather data herself rather than rely on data gathered by others; and

---

[78] *See* 2013 Tankesley Depo. Tr. at 11:20-22 (testifying "[s]pecial projects are listed in your position description as part of your position description"); Def. Exh. 7, Human Resource Specialist Position Description (Dkt. 51-1) (noting that duties and responsibilities include "provid[ing] expert level advice" and "serv[ing] as a trouble-shooter, providing authoritative advice and guidance on problems not susceptible to treatment by accepted methods").

[79] *See Harris v. Evans*, 66 F. App'x 465, 467-68 (4th Cir. 2003) (holding that reassignments, temporary detail, and decreased job duties did not "demonstrate the requisite adverse action"); *McLaughlin v. Barr*, 2020 WL 869914, at *11 (M.D.N.C. Feb. 21, 2020) (holding that a temporary change in duties did not constitute an adverse action).

[80] Plaintiff's and Tankesley's other conclusory statements that Jones unreasonably interfered with *every* assignment cannot support this retaliation claim. *See Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998) (holding that the plaintiff's conclusory statements that he was treated unfavorably were insufficient to support a discrimination claim at summary judgment).

(ii) where Jones assigned Tankesley and another employee to perform the same work. *See* 2017 Tankesley Depo. Tr. at 86-92; *id.* at 175-176.[81] But these interactions would not deter a reasonable employee from complaining about discrimination as plaintiff fails to explain how they fall outside the ordinary interactions of a supervisor and employee. On their face, plaintiff's examples merely demonstrate a supervisor correcting an employee or a supervisor assigning two people to a project and asking them to share notes.[82] Thus, these two examples do not constitute a materially adverse action.

Seeking to avoid this conclusion, plaintiff attempts to tie these interactions, together with the PII-related Operation Cockroach comment, to the Fourth Circuit's description in *Laurent-Workman* of a "multi-act story of undermining, gaslighting, and disruption." *Laurent-Workman*, 54 F. 4th at 218. As the June 17, 2022 Order reflects, at the motion to dismiss stage this Court credited plaintiff's allegations in that regard and permitted plaintiff's retaliation claim to proceed to discovery. *See* June 17, 2022 Order at 10-11. But summary judgment requires more than plaintiff's mere allegations and plaintiff must show that Jones' actions would deter a reasonable employee from making a complaint of discrimination. Jones' correction regarding how Tankesley performed a project and decision to staff multiple people on a project are not the kinds of interactions to deter victims of discrimination from making complaints. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (discussing the importance of separating "significant

---

[81] Plaintiff also cites another portion of Tankesley's 2017 deposition, but it does not appear to relate to this argument or to Tankesley's assignment to special projects. *See* Opp'n Br. at 23, n. 39 (citing Tankesley Depo. Tr. at 215). Plaintiff also cites to Tankesley's inadmissible 2017 Declaration and EEO Affidavit to support this argument as well as portions of Lewis' deposition referring to Tankesley's lack of a mentor. *See* Opp'n Br. at 28. Because these citations are either inadmissible or do not relate to Tankesley's inability to complete her assigned special projects, they will not be considered here.

[82] *See* 2017 Tankesley Depo. Tr. at 90 (explaining that Jones "wanted [Tankesley] to run those reports" instead of "asking the people responsible for housing that data to run the reports"); *id.* at 175 (testifying that Jones told Tankesley to give another "any notes that you have and she'll put them together").

from trivial harms").[83] Indeed, Tankesley admits in her deposition that Jones' communications with her appear "just normal," but that she read within them a sinister meaning not conveyed on their face.[84] Accordingly, the summary judgment record does not establish that Jones engaged in a materially adverse action by supervising Tankesley's work and defendant's motion for summary judgment must be granted with respect to the retaliation claim.

In an effort to save his retaliation claim, plaintiff, without explanation or citation to case authority, argues that Jones' July 2011 emails containing standard language regarding Tankesley's return to work constitute a materially adverse action. *See* Opp'n Br. at 25; Dean Aff. at 4 (stating that all employees on extended leave receive this warning). But this argument fails because courts of appeals and district courts within the Fourth Circuit agree that similar warnings are not materially adverse.[85] In these circumstances, a standard warning that remaining absent from work after leave expires may result in discipline is among the "minor annoyances that often take place at work and that all employees experience" and is not materially adverse. *White*, 548 U.S. at 68.

The final purported materially adverse action relied upon by plaintiff stem from the PII incident – specifically, Jones' alleged yelling, the Notice of Proposed Suspension, and the issuance

---

[83] This is another form of plaintiff's argument that Tankesley was the subject of heighted supervision by a supervisor, which, as discussed *supra*, is not a materially adverse action. *See Belton v. City of Charlotte*, 175 F. App'x at 658 (4th Cir. 2006) (holding that allegations of "close scrutiny" of equipment requests "cannot sustain" a retaliation claim); *Holley v. N.C. Dept. of Admin., N.C.*, 846 F. Supp. 2d 416, 442 (E.D.N.C. 2012) (holding that "allegedly heightened scrutiny of an employee's work product, without more, does not constitute a materially adverse employment action").

[84] *See* 2017 Tankesley Depo. Tr. at 91 ("And her emails, while to you would like, well, this is just normal, to me, I know what she's saying in them.").

[85] *See, e.g., Perez v. Brennan*, 766 F. App'x 61, 64 (5th Cir. 2019) (holding that a warning letter about attendance was not materially adverse); *Seigner v. T'Ship of Salem*, 654 F. App'x 223, 231 (6th Cir. 2016) ("We agree with the district court that Rachwal's conduct in warning plaintiff about his below-twenty-percent participation rate does not rise to the level of a materially adverse action."); *Garrett v. Barsa*, 2021 WL 5768120, at *7 (E.D. Va. Sept. 27, 2021) ("Courts in the Fourth Circuit have generally found that action which essentially amount to criticism of an employee such as performance evaluations, reprimands or warnings, and counseling are along insufficient to constitute materially adverse actions under the *White* standard.").

of a letter of reprimand in connection with the PII incident.[86]   Yet this also fails to persuade, because, as discussed *supra* at footnote 82, district courts within the Fourth Circuit have held that similar discipline is not materially adverse.  *See Garrett*, 2021 WL 5768120, at *7 (E.D. Va. Sept. 27, 2021) ("Courts in the Fourth Circuit have generally found that . . . performance evaluations, reprimands or warnings, and counseling are along insufficient to constitute materially adverse actions under the *White* standard."); *Stoyanov v. Mabus*, 126 F. Supp. 3d 531, 550 (D. Md. 2015) ("A reasonable employee would not have thought the incidents relating to the Notice of Proposed Suspension and the letter of reprimand, when viewed together, where materially adverse".).  And courts of appeals have similarly found that proposed discipline that ultimately are not imposed, such as the Notice of Proposed Suspension here, do not constitute a materially adverse action.  *See Baloch v. Kempthorne*, 550 F. 3d 1191, 1199 (D.C. Cir. 2008) (holding that "courts have been unwilling to find adverse actions where the suspension is not actually served").[87]  Nor does Jones alleged verbal rebuke of Tankesley constitute a materially adverse action.  *See Adams v. Anne Arundel Cnty. Public Schs.*, 789 F.3d 422, 431 (4th Cir. 2015) (holding that "verbal attacks" and upbraiding of employee could not establish retaliation claim).  Accordingly, none of Jones' acts in connection with the PII incident constitute a materially adverse action.

In sum, most of the actions which plaintiff alleges are materially adverse are not supported by the summary judgment record.  And even those that are, do not meet the *White* standard of materially adverse.  Accordingly, plaintiff has failed to establish any materially adverse action to

---

[86] Although Lewis issued the Notice of Proposed Suspension in consultation with Karen Dean and Employee Relations, there is some suggestion in Lewis' affidavit that Jones' directed Lewis to do so.  *See* Lewis Aff. at 7 (Dkt. 54-8).  Accordingly, taking the inferences in the light most favorable to the nonmovant, the Notice of Proposed Suspension will be treated as if it was initiated by Jones.

[87] *See also Fercello v. Cnty of Ramsey*, 612 F.3d 1069, 1080-81 (8th Cir. 2010) (where a proposal was not completed it is not materially adverse).

support his retaliation claim and summary judgment must enter in favor of defendant.

### 3. Causation

Plaintiff also fails to establish a causal connection between Jones' conduct and Tankesley's protected activities.  Importantly, plaintiff's arguments make clear that not even plaintiff views Jones' actions as related to Tankesley's protected activities; rather, plaintiff views Jones' conduct as based solely on Tankesley's disabilities.[88]  Thus, even assuming that plaintiff has established any materially adverse action (which he has not), summary judgment must still enter in favor of defendant because a review of those alleged retaliatory actions reveals no causal connection to plaintiff's protected activities.[89]

To begin with, plaintiff deceptively alleges that the requirement to attend one-on-one meetings and to submit status reports occurred in "Fall 2010" such that they would appear temporally related to the October 27, 2010 meeting regarding Tankesley's reasonable accommodations.  *See* Opp'n Br. at 24.  Yet, the undisputed factual record establishes that this conduct began *before* the October 27, 2010 meeting and thus could not support an inference of causation.  *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Next, Jones' alleged verbal assault of Tankesley for the PII boxes took place in February 9, 2011 – well after the October 27, 2010 meeting and well before any other protected activity.  As

---

[88] *See, e.g.,* Opp'n Br. at 21 ("Defendant took adverse actions against Ms. Tankesley *solely* because of her disabilities." (emphasis added)).

[89] Not addressed here are the purported materially adverse actions where the summary judgment record does not support that those actions even occurred, such as Jones' alleged denial of sick leave on May 5, 2011.

the Fourth Circuit has consistently held, even a lapse of only "two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005). The other alleged material adverse actions related to the PII suffer a similar lack of temporal connection. On first glance, the March 9, 2011 Notice of Proposed Suspension appears temporally connected to Tankesley's March 1, 2011 protected activities. But the March 9, 2011 Notice was issued by *Lewis* and Jones' instructions to Lewis following the February 2011 PII incident obviously took place well before the March 9 date, because, before Lewis issued the Notice, Lewis consulted with two different groups –Karen Dean and Employee Relations. *See* Lewis Aff. at 7. Thus, plaintiff has not established that *Jones*' involvement with respect to the Notice took place after Jones learned of Tankesley's March 1, 2011 protected activities such that there can be no inference of retaliation. *See Francis*, 452 F.3d at 309 (holding that gradual adverse actions before a protected activity do not give rise to an inference of discrimination). Likewise, the actual Letter of Reprimand was issued by Jones in September 2011 months after any protected activities of which Jones was aware and the Letter of Reprimand reduced plaintiff's proposed discipline. *See Horne*, 154 F. App'x at 364 (holding that the passing of two months weakens causation).[90] Plaintiff's remaining alleged materially adverse actions – Jones' July 2011 emails and the September 2011 temporary reassignment to special projects – also came months after Tankesley's March 2011 protected activities, which was the last protected activity of which Jones had knowledge. *See id.* Not only is there no temporal proximity between any of Jones' alleged adverse actions and Tankesley's protected activities, but plaintiff points to no comments from Jones regarding those protected activities.

---

[90] *See also Pascual v. Lowe's Home Cntrs., Inc.,* 193 F.App'x 229, 233 (4th Cir.2006) (finding no causal connection where three to four months passed between claimed protected activities and termination).

Seeking to avoid this conclusion, plaintiff relies on *Lettieri v. Equant, Inc.*, 478 F.3d 640 (4th Cir. 2007) in an attempt to string together each of the alleged materially adverse actions to create an inference of causation. In *Lettieri*, the Fourth Circuit recognized that "[i]n cases where temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." 478 F.3d at 650. But plaintiff's reliance on *Lettieri* is misplaced, because the facts of this case do not resemble those in *Lettieri*. Here, plaintiff can point to no recurring animus based on protected activities. Rather, plaintiff relies on discipline implemented after a policy violation, stray remarks made to other employees, and trivial matters that are part of the everyday annoyances of the workplace. *See Walton v. Harker*, 33 F.4th 165, 178 (4th Cir. 2022); *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 157 (4th Cir. 2023) (distinguishing *Lettieri* where comments were "neither numerous nor continuous" and where they were "not contemporaneous" with alleged materially adverse action). Thus, even assuming that plaintiff has set forth a materially adverse action (which he has not), plaintiff fails to establish causation between Tankesley's protected activities and any alleged materially adverse action and cannot establish a *prima facie* case of retaliation.

### 4. No Pretext

Even assuming *arguendo* that plaintiff has established a *prima facie* case of retaliation for any of the acts that he contends are materially adverse actions,[91] defendant has proffered a legitimate non-discriminatory reason for each act and plaintiff has failed to establish pretext, namely that defendant's explanation "is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004). Assuming that any of the actions that plaintiff lists qualifies as a

---

[91] Again, not addressed here are alleged materially adverse acts for which there is no admissible, record evidence.

materially adverse action (which they do not), plaintiff has failed to show pretext or to offer evidence that the real reason that any action was retaliation against Tankesley.

To begin with, defendant has explained that Tankesley was reassigned to special projects because Jones wished to ease Tankesley back into work after Tankesley's extended absence. *See* Def. Exh. 9, ¶ 5, Oct. 20, 2022 Jones Declaration (Dkt. 51-1). And plaintiff has failed to adduce any evidence that this reason is pretextual. As previously noted, Tankesley had been assigned to special projects in some capacity since 2007. Indeed, plaintiff cites deposition testimony from Lewis that explicitly undermines plaintiff's arguments that Jones acted in retaliation for protected activities. *See* Lewis Depo. Tr. at 373-74 (testifying that she "wouldn't say" that Jones acted "based upon the fact that I filed the EEO compliant"). Moreover, evidence cited by plaintiff demonstrates that Tankesley was not the only person assigned to special projects. *See* Opp'n Br. at 25 (citing PEX 19, Dkt. 54-22 which shows Dublin Byars was also working on Special Projects and that Tankesley was assigned "HSPD-12, EEO Coordination, Reinstatement Vacancy – GS-14, 80-day report, Special Projects"). Accordingly, plaintiff has not demonstrated that defendant's explanation for Tankesley's temporary reassignment to special projects is pretext for retaliation.

Next, plaintiff has failed to carry his burden to establish pretext with respect to the three alleged materially adverse actions related to the PII that Tankesley left in the public hallway: (i) Jones yelling at Tankesley; (ii) Tankesley receiving the notice of proposed suspension; and (iii) Tankesley receiving the letter of reprimand. But in response, defendant offers the legitimate, non-retaliatory explanation for all three of these alleged materially adverse actions that Tankesley violated rules for storing PII. *See* Reply at 15. This is undisputed and was conceded by Tankesley in her deposition. *See* 2017 Tankesley Depo. Tr. at 347-48 (admitting that "Vanessa and I" moved

the boxes into the hallway and that two of the boxes contained PII);[92] July 2011 Email Forwarding July 2010 Email (Dkt. 51-2) (instructing employees to "Secure, lock up or shred PII when in physical form – lock offices, file cabinets, etc. to restrict access to data with PII information."). Importantly, the Fourth Circuit has recognized that a plaintiff fails to establish pretext where an employee does not dispute that her conduct was a violation of policy, but "merely provides an explanation for why her record is unusual." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 722 (4th Cir. 2013). Such is the case here; plaintiff argues that "everyone" left PII out in public places but does not dispute that it was inappropriate for Tankesley to do so. Additionally, although plaintiff makes a generic argument of different treatment, plaintiff does not point to any specific similarly situated comparator who did not engage in protected activities to establish an inference of retaliation.[93] Moreover, although Jones initiated the consideration of discipline related to the PII incident, the undisputed factual record establishes that Jones actually *reduced* the punishment after it was formally proposed by Lewis and Dill to a Letter of Reprimand. *See* Notice of Proposed Suspension by Lewis (Dkt. 54-16); Letter of Reprimand by Jones (Dkt. 54-21). Thus, plaintiff has failed to establish pretext with respect to any materially adverse action related to the PII incident.

Finally, defendant has also produced a legitimate, non-retaliatory reason for including the warning language that, if Tankesley failed to report to work after her leave concluded, then Tankesley could be charged as AWOL and could ultimately be removed from federal service on that basis. *See* Reply at 15; Def. Exh. 42, July 2011 Jones/Tankesley Email Exchange (Dkt. 51-

---

[92] *See also* 2017 Tankesley Depo. Tr. at 354:19-20 (referring to "my PII" in connection with this incident).

[93] As the Fourth Circuit has sensibly held, a plaintiff's conclusory statements regarding differential treatment are not sufficient to withstand summary judgment. *See Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (holding that the plaintiff's "conclusory statements" about differential treatment "without specific evidentiary support" were insufficient to defeat a motion for summary judgment); *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (holding that plaintiff's affidavit, "mostly made up of conclusory statements" was not enough to prevail at summary judgment).

3).  Importantly, plaintiff does not dispute that Jones never put Tankesley on a performance improvement plan, gave her any performance warning, or threatened to fire her.[94] Moreover, all employees who are on extended leave receive a similar email including that warning. *See* Dean Aff. at 4 ("All employees who are on extended leave are advised in writing that if they do not return to work on the day expected, they could be charged Absent Without Leave (AWOL). . ."). And Tankesley did not view this as a threat. *See* Tankesley 2017 Depo. Tr. at 28-29 ("She never verbally threatened to fire me."). Moreover, plaintiff has not identified any contrary evidence indicating that this was not standard language or any evidence that connects the emails to Tankesley's protected activities. Indeed, Jones' July 2011 emails came more than three months after Tankesley's last protected activities.[95]  Because plaintiff fails to point to any evidence that connects Jones' July 2011 emails to Tankesley's Rehabilitation Act-related protected activities, plaintiff has failed to create a genuine issue of material fact demonstrating that retaliation was the true motive for Jones' July 2011 emails or that defendant's explanation is pretextual.

*     *     *

In sum, plaintiff cannot establish a *prima facie* case of retaliation because he cannot demonstrate that Tankesley suffered a materially adverse action and because he cannot show any causal connection between any action by Jones and Tankesley's protected activities. Furthermore, defendant has offered legitimate, non-discrimiantory reasons for Jones' actions and plaintiff has not carried his burden to show that such reasons are pretextual.  Accordingly, summary judgment must enter in favor of defendant on the retaliation claim (Count II).

---

[94] *See* Mem. Supp. of SJ at 12, ¶ 63; Opp'n Br. at 7 (asserting that facts 62-73 are undisputed).

[95] Although Jones' July 2011 emails are close in time to Tankesley's June 23, 2011 formal EEO complaint, as discussed *supra* there is no evidence in the record that Jones had any knowledge of that protected activity.

60

## VII.

In Count III, plaintiff asserts that Tankesley was subject to a disability-based and retaliatory hostile work environment.  Defendant seeks summary judgment arguing that plaintiff complains only of "standard, managerial acts," that none of Jones' acts were based because of Tankesley's disability, and that none of Jones' acts were sufficiently severe or pervasive to establish a hostile work environment.

As the Fourth Circuit has recognized, to establish a disability-based hostile work environment, plaintiff mush show: (i) that Tankesley was a qualified person with a disability; (ii) that she was subjected to unwelcome harassment; (iii) that the harassment was based on her disability; (iv) that the harassment was so severe or pervasive as to alter a term, condition, or privilege of employment; and (v) some factual basis exists to impute liability to the employer. *See Jessup v. Barnes Grp., Inc.*, 23 F. 4th 360, 367 (4th Cir. 2022).  The only elements that change with respect a retaliation-based hostile work environment claim are the first – namely plaintiff does not have to show that she was a qualified person with a disability – and the third, because the harassment must be based on a protected activity rather than disability. *See Knight v. McCarthy*, 439 F. Supp. 3d 744, 762 (E.D. Va. 2020).  The Fourth Circuit has held that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test," and has explained that "rude treatment . . . , callous behavior by one's supervisors, or a routine difference of opinion and personality conflict with one's supervisors are not actionable." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal citations omitted).  Moreover, "a plaintiff cannot rely on her own 'conjecture' to impute a [discriminatory] character to what appears to be neutral harassment." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 409 (4th Cir. 2022).

Here, plaintiff cannot meet the high bar set by the severe or pervasive requirement.

61

Plaintiff complains that: (i) Jones instructed other employees not to assist Tankesley; (ii) Jones required Tankesley to attend status meetings; (iii) Jones disciplined Tankesley for violating PII policies; (iv) Jones failed to provide plaintiff with a private office; (v) Jones sent Tankesley an email containing standard language about returning to work from FMLA leave; and (vi) Jones assigned Tankesley to special projects. To begin with, such a list overstates the evidence. The undisputed factual record is that Jones instructed one employee – Gooley – not to assist plaintiff. But despite Jones' alleged instruction, Gooley did assist Tankesley and Tankesley was not aware of Jones' instruction to Gooley; indeed, if any such instruction was given to other employees, Tankesley was unaware of it. *See* 2013 Tankesley Depo. Tr. at 61:13-19. Moreover, Tankesley does not dispute that Byars, Russell, Carreiro, and Gooley *did* help Tankesley with her work. With respect to plaintiff's allegations regarding the lack of a private office, plaintiff omits that Tankseley never requested a private office and that, after March 8, 2011, Tankesley worked in her office alone. *See* 2017 Tankesley Depo. Tr. at 147:3-9 (conceding that she never requested a private office, but to reconfigure the office); *id.* at 139:16-22 (conceding that she had her own office).

Even considering each of plaintiff's complaints about Tankesley's treatment, Jones' actions do not rise to the level of severe or pervasive conduct. As the Fourth Circuit has held, where an employee complains that her "responsibilities were adjusted and [s]he was supervised more than [s]he preferred," those actions "do not rise to the level of harassment necessary to support a hostile work environment case." *Pritchard v. Metro. Washington Airports Auth.*, 860 F. App'x 825, 828 (4th Cir. 2021). Actions such as Tankesley's reassignment to special projects similarly do not rise to the level of "abusive actions" necessary to establish a hostile work environment, especially where Tankesley had previously served in that position and where

Tankesley enjoyed the work.[96] *See Combs-Burge v. Rumsfeld*, 170 F. App'x 856, 862 (4th Cir. 2006) (holding that "assigning individuals to remedial tasks to correct their job performance and assigning individuals to difficult jobs are not objectively abusive actions" and emphasizing that courts do not "sit as a kind of super-personnel department").  In short, plaintiff's complaints about Jones' treatment of Tankesley, where they are supported by the record, do not rise to the level of abusive actions necessary establish the severe or pervasive element of a hostile work environment claim.

To be sure, plaintiff does make some very serious allegations about the treatment that Tankesley suffered at the hands of Jones.  But these allegations are not supported by the summary judgment record and, thus, cannot save plaintiff's hostile work environment claim.  Plaintiff repeats his focus on the so-called "Operation Cockroach," which the record does not support connecting to plaintiff's disability status or protected activities.  Lewis, to whom Jones is alleged to have made the statement, testified that the statement was made in connection with the boxes of PII that Tankesley left in the hallway due to a concern of attracting bugs.  *See* Lewis Depo. Tr. at 47:3-13 (testifying that Operation Cockroach related to the boxes containing PII because "when you have a bunch of boxes, they collect cockroaches pretty much").  As discussed *supra*, Lewis' contrary statements in her declaration are inadmissible.  Moreover, as defendant correctly contends, Tankesley was unaware of the remark and Jones never made the remark in plaintiff's presence.  *See* 2017 Tankesley Depo. Tr. at 84:3-8.  As courts recognize, "statements or acts of which a plaintiff was unaware . . . cannot show that a reasonable person would perceive [her] environment as objectively hostile *at that time*." *Jessup*, 23 F.4th at 369 (emphasis in original). Similarly, to support plaintiff's claims that Jones questioned Tankesley's mental status, plaintiff

[96] *See* Def. Exh. 44, Carl Tankesley Depo. Tr. at 53:9-13 (testifying that Tankesley "enjoyed" special projects and that "it made her feel special") (Dkt. 51-3).

relies only on the inadmissible 2017 Tankesley Declaration. *See* Opp'n Br. at 28 (citing 2017 Tankesley Declaration).

Nor does the summary judgment record support plaintiff's construction of two other incidents. Plaintiff claims that Jones "viciously assaulted Ms. Tankesley on February 9, 2011 over banker's boxes and subsequently disciplined Ms. Tankesley over the PII supposedly contained in the boxes." Opp'n Br. at 28. The summary judgment record does not reflect that Tankesley was "assaulted" by Jones.[97] Rather, the record reflects that Tankesley left PII in the hallway, which was a violation of PII storage practices, and that, after *Dean and Lewis* recommended that Tankesley be suspended, *Jones* determined it was more appropriate to impose a less severe penalty. *See* 2017 Tankesley Depo. Tr. at 347-48 (admitting that "Vanessa and I" moved the boxes into the hallway and that two of the boxes contained PII);[98] July 2011 Email Forwarding July 2010 Email (Dkt. 51-2) (instructing employees to "Secure, lock up or shred PII when in physical form – lock offices, file cabinets, etc. to restrict access to data with PII information."); Notice of Proposed Suspension by Lewis (Dkt. 54-16); Letter of Reprimand by Jones (Dkt. 54-21).[99] With respect to plaintiff's claim that Tankesley was harassed while on FMLA leave, the summary judgment record

---

[97] Plaintiff also claims that the PII incident adversely effected Tankesley's health such that she was required to take five months of medical leave; however, plaintiff cites no record evidence for that assertion. *See* Opp'n Br. at 29 (asserting that "Jones' threatening behavior directly affected Ms. Tankesley's health and job performance" without citation to the record). Indeed, it appears that this allegation is drawn from the inadmissible Tankesley Affidavits and Declaration. *See* Opp'n Br. at 14 & n. 24 (discussing mental health and need for FMLA leave and citing 2017 Tankesley Declaration and 2011 Tankesley EEO Affidavit).

[98] *See also* 2017 Tankesley Depo. Tr. at 354:19-20 (referring to "my PII" in connection with this incident).

[99] Although plaintiff asserts, in reliance on Tankesley's deposition testimony, that other employees also left PII in public places, plaintiff does not include any identifying information about who those people may be so that it could be determined whether Tankesley was treated differently from other, similarly situated employees. Nor does Tankesley's deposition explain how she knew that other employees who left PII in public spaces were not disciplined. Courts recognize that "[r]easonable disciplinary measures . . . cannot support a hostile work environment claim" and "vague assertions" that a plaintiff was "singled out" for discipline similarly cannot establish a hostile work environment claim. *Nelson-Rogers v. Kaiser Permanente*, 2020 WL 917067, at *11 (D.Md. Feb. 25, 2020).

reflects only that Jones included standard language in the email to Tankesley about Tankesley's return to work and about the consequences for not returning to work as scheduled. *See* Dean Aff. at 4 ("All employees who are on extended leave are advised in writing that if they do not return to work on the day expected, they could be charged Absent Without Leave (AWOL). . ."). But even if these allegations were as plaintiff paints them, the Fourth Circuit has held that similar allegations are insufficient to establish a hostile work environment claim.[100]

Plaintiff has not only failed to establish that any of Jones' conduct rises to the level of severe or pervasive harassment but has also failed to establish that Jones' conduct was related to Tankesley's disability or protected activities. Indeed, plaintiff's opposition brief does not attempt to explain how any of Jones' alleged harassing conduct is related to Tankesley's protected activities. Nor does plaintiff attempt to establish any timeframe to connect Jones' alleged harassing conduct to Tankesley's protected activities.[101] Thus, there is insufficient evidence on this summary judgment record that Jones' alleged conduct was because of Tankesley's protected activities. With respect to the argument that Jones' alleged conduct was because of Tankesley's disability status, as noted previously, the summary judgment record establishes that Jones' statement to Lewis about Operation Cockroach was meant to refer to the banker's boxes containing PII that Tankesley left in the hallway. *See* Lewis Depo. Tr. at 84:3-13. Importantly, as Tankesley testified in her deposition, neither Jones nor any other USPTO employee said anything negative to Tankesley

---

[100] *See Holloway v. Md.*, 32 F.4th 293, 301 (4th Cir. 2022) (affirming dismissal of hostile work environment claim where plaintiff alleged that a supervisor yelled at the plaintiff, slammed documents on the table, required plaintiff to call his sir, refused to communicate with plaintiff directly, and routinely criticized plaintiff).

[101] The only references to Tankesley's protected activities in the portion of the opposition brief referencing the hostile work environment claim is the conclusory sentence that "a jury reasonably could conclude that the reign of terror unleashed on Ms. Tankesley was taken because of her disabled status and in retaliation for her protected activities." Opp'n Br. at 28. Indeed, elsewhere in the brief plaintiff argues that "Defendant took adverse actions against Ms. Tankesley *solely* because of her disabilities." Opp'n Br. at 21." (emphasis added).

65

regarding Tankesley's disability. *See* 2017 Tankesley Depo. Tr. at 19-20, 24, 27. Although Jones made a single mention to Tankesley about exploring disability retirement, courts have recognized that comments do not reflect discriminatory animus.[102] The other comment that plaintiff attempts to rely on is Jones' alleged comment that Tankesley's reasonable accommodation gave Tankesley the "keys to the candy store." Lewis 2011 EEO Aff. at 3, 5.[103] But, again the statement was not made *to* Tankesley, and Lewis herself viewed the remark as only reflecting Jones' view that the reasonable accommodation was too generic and broad. *See id.* ("Ms. Jones felt like Ms. Omata gave Ms. Tankesley the key to the candy store because the reasonable accommodation was so generic."). Plaintiff also does not connect that statement to any of Jones' conduct. Plaintiff also claims that Jones stood in the way of Tankesley receiving necessary training. *See* Opp'n Br. at 28. But again, plaintiff relies on inadmissible evidence for many of these claims, and Tankesley's deposition testimony establishes that she was not "denied an opportunity as far as not being given an opportunity to go." 2017 Tankesley Depo. Tr. at 67:1-5. Thus, plaintiff has failed to establish that any of Jones' conduct, even it did rise to the level of severe or pervasive harassment, was based on Tankesley's disabilities.

In sum, plaintiff has failed to establish that Jones' alleged harassment of Tankesley was "severe or pervasive" as required by the Fourth Circuit, or that any of Jones conduct was based on

---

[102] *See Hinton v. City College of N.Y.*, 2008 WL 591802, at *23 (S.D.N.Y. Feb. 29, 2008) (holding that, standing along, asking about whether a plaintiff wished to explore disability retirement was not evidence of discriminatory animus); *c.f. EEOC v. Delta Chem. Corp.*, No. 07-2572, 2008 WL 4833098, at *5 (D. Md. Nov. 3, 2005) ("[A] question from an employer about an individual's age and retirement plans is 'a textbook example of an isolated remark which demonstrates nothing.'"); *Harris v. Powhatan Bd. of Supervisors*, 2021 WL 2673045 at *4 n.8 (E.D. Va. June 29, 2021) (noting the Court's "serious doubts" that a single suggestion that the plaintiff retire "constitutes direct evidence of age discrimination").

[103] Defendant argues that the Lewis' 2011 EEO Affidavit does not make it clear that Jones ever made the "keys to the candy store" remark. Reply at 4 n.4. Defendant fails to note, however, that Lewis' 2011 EEO Affidavit makes two references to the "candy store" remark, once on page 3 and once on page 5 of the affidavit. In the first reference, Lewis is clear that "Ms. Jones stated that the reasonable accommodation that Patricia Omata approved basically gave Ms. Tankesley the key to the candy store." Lewis 2011 EEO Aff. at 3.

Tankesley's protected activities or disability status. Thus, summary judgment must enter in favor of defendant with respect to plaintiff's hostile work environment claim.

## VIII.

In summary, although at first glance this case appeared to present compelling allegations of outrageous behavior by Jones, and although plaintiff's briefs are full of strong rhetoric regarding the purported reign of terror that Jones imposed, the admissible record on summary judgment simply does not support plaintiff's claims. Ultimately, plaintiff's arguments reveal that he wants the record construed in contradictory ways to support his position. Namely, plaintiff contends that Tankesley was discriminated against when she was not provided with the support she wanted in the form of training and mentorship while simultaneously arguing that defendant discriminated against Tankesley when it took steps to provide the very support that Tankesley requested by closely supervising Tankesley. A close examination of the record in this case demonstrates that most of Tankesley's complaints are either unsupported by the record or are the kind of petty slights, minor annoyances, and lack of good manners that do not support a claim under the Rehabilitation Act. In the end, this case proves the maxim that federal courts should not sit "as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998). Accordingly, summary judgment must be granted in favor of defendant on each of plaintiff's remaining three claims of disability discrimination (Count I), retaliation (Count II), and a hostile work environment (Count III).

An appropriate Order will enter.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, VA
June 29, 2023

/s/

T. S. Ellis, III
United States District Judge